**EDWARD D. JONES & COMPANY, and Delmar "Bo" McKinney, Petitioners,**

v.

**Pat FLETCHER, Independent Executrix of the Estate of Beatrice Clark Cairns, Deceased, Respondent.**

No. 95–1344.

Supreme Court of Texas.

Argued Jan. 15, 1997.

Decided May 8, 1998.

Rehearing Overruled Oct. 15, 1998.

David E. Jackson, Shannon H. Ratliff, Marc O. Knisely, D. L. (Lin) Hughes, Karen L. Watkins, Austin, for Petitioners.

Mark M. Humble, Cameron, James V. Sylvester, Aaron L. Jackson, Austin, for Respondent.

HECHT, Justice, delivered the opinion of the Court.

The principal question in this case is whether a stockbroker has a legal duty to ascertain an elderly person's mental capacity

before assisting her in transferring stock. Because the law already affords protection to incompetents through guardianships and by making their agreements voidable, we decline to create a duty to refrain from dealing with an elderly person without first determining the person's mental competence. Consequently, we reverse the judgment of the court of appeals, —— S.W.2d —— (per curiam), and render judgment for defendants.

## I

Carlton Anness asked Delmar "Bo" McKinney, a stockbroker employed by Edward D. Jones & Company, to help transfer securities owned by Anness's aunt, Beatrice Clark Cairns, to Anness. At the time Cairns was a 91–year–old widow in declining health. Anness and his wife had lived with and taken care of Cairns for more than two years, and Cairns had paid them for their services. Cairns's niece, Pat Fletcher, had managed Cairns's financial affairs for ten years following the death of Cairns's husband, but Fletcher returned that responsibility to Cairns a few weeks before Anness contacted McKinney. Anness had Cairns's power of attorney.

Anness proposed to effectuate the stock transfers using the power of attorney Cairns had given him, but McKinney was uncomfortable with this proposal. McKinney did not know Anness or Cairns and insisted on meeting with Cairns before assisting with the transfer, so Anness arranged for McKinney to come to Cairns's home. McKinney conversed with Cairns at her kitchen table and helped her endorse to Anness securities worth more than $300,000. The meeting lasted from 7:00 to 11:00 p.m. The Annesses were in the house during this time but not in the kitchen with McKinney and Cairns.

McKinney received no compensation for assisting Cairns with the transfer, but over the next year he assisted Anness in other transactions for which he was paid a commission. Specifically, McKinney assisted Anness in selling securities to purchase a $213,000 variable annuity from Lincoln National Life Insurance Company to reduce Anness's tax liability on the income from the securities.

McKinney also arranged for several loans from Jones & Co. to Anness secured by his portfolio.

A year following the stock transfers, Fletcher and another of Cairns's nieces, Pat Weaver, concerned that Anness was taking advantage of Cairns, petitioned for Weaver to be appointed Cairns's guardian. Fletcher also obtained a writ of sequestration for Cairns's property. When served with the writ, McKinney disclosed the existence of the Lincoln annuity, but he did not tell Lincoln or Anness about the writ or do anything to prevent liquidation of the annuity. At a hearing in the guardianship proceeding about a month after it was filed Anness testified that he still had the annuity. Fletcher did not attempt to compel its production or enjoin its liquidation and did not serve the writ of sequestration on Lincoln. Several days after the hearing, Anness requested and received from Lincoln the surrender value of the annuity, a little more than $190,000, and deposited it in the account of a business associate, Robert Dyer. Within a few days, Weaver, who had been appointed Cairns's guardian, learned of the annuity's liquidation and filed the present lawsuit against Anness, Dyer, and Lincoln.

Two months later Cairns died. Anness initiated probate proceedings, which Fletcher contested. Fletcher contended that the will Anness offered was executed at a time when Cairns lacked testamentary capacity and was unduly influenced by Anness. Fletcher offered for probate instead a will executed two years earlier. The probate court appointed Fletcher temporary administrator of Cairns's estate, and Fletcher then substituted for Weaver as plaintiff in the present action. Fletcher and Anness eventually agreed to a judgment in the probate proceeding admitting the will offered by Fletcher to probate, appointing Fletcher independent executrix, and awarding Cairns's estate actual and punitive damages of $1,700,000 against Anness. The judgment also recited that from the day following Cairns's execution of the earlier will, Cairns "lacked the requisite testamentary capacity to execute a will eligible for probate."

Fletcher then amended her pleadings in the present action to name McKinney and Jones & Co. as defendants. Anness filed for bankruptcy, and the parties' various claims against him were severed from this action. The remaining claims were tried before a jury. The district court instructed the jury that McKinney owed Cairns a fiduciary duty and a duty of good faith and fair dealing at all times. The jury made several findings concerning McKinney's liability to Cairns, namely that: (1) the security transfers were negligent and/or a breach of McKinney's fiduciary duties to Cairns; (2) McKinney was negligent in opening a securities trading account for Anness; (3) McKinney employed one or more "fraudulent, manipulative and/or deceptive devices"—defined as "any plan, scheme or other action which has a tendency to mislead or deceive or which takes advantage of another person's lack of knowledge"—in connection with Cairns; (4) McKinney failed to comply with his duty of good faith and fair dealing to Cairns; (5) McKinney was negligent in participating in the creation of the annuity, in participating in the liquidation of the annuity, and/or in failing to prevent the proceeds of the annuity from reaching Anness; (6) McKinney negligently misrepresented to the court in the guardianship proceeding that the annuity had been subjected to court orders and/or process prohibiting its disposition; and (7) McKinney and Anness engaged in a civil conspiracy to cause the security transfers and the liquidation of the annuity. The jury failed to find that Cairns had sufficient mental capacity to execute the security transfers, but it was not asked to find that Cairns lacked such mental capacity or that McKinney knew that she was incompetent. The jury found that McKinney's misconduct, and no one else's, was a proximate cause of damage to Cairns, that McKinney was grossly negligent, and that McKinney was Lincoln's agent. The jury assessed actual damages of $1,000,000 for Cairns' mental anguish, $50,000 for lost stock value, $100,000 for unpaid loans, and $213,000 for loss of the annuity. The jury also assessed $1,000,000 punitive damages against Lincoln and Jones & Co. each. The court rendered judgment against Jones & Co. for $2,150,000, against Lincoln

for $1,000,000, and against McKinney and Lincoln, jointly and severally, for $213,000, with pre- and post-judgment interest on all awards. No recovery was ordered against Dyer.

McKinney, Jones & Co., and Lincoln all appealed, but Lincoln settled with Fletcher for $200,000 while the appeal was pending. The court of appeals affirmed the judgment against McKinney and Jones & Co., holding that the judgment could rest on the jury's findings of negligence and gross negligence and refusing to consider whether McKinney owed Cairns any duty that he breached. —— S.W.2d —— (per curiam). The court held that the evidence supported all the jury's findings. We granted McKinney and Jones & Co.'s application for writ of error. 40 TEX. SUP.CT. J. 148 (Dec. 13, 1996).

## II

Fletcher's primary contention is that McKinney owed Cairns a duty not to assist her in transferring her stock to Anness without first ascertaining whether she was mentally competent to decide to make the transfer. However, Fletcher, McKinney, and the court of appeals have each taken the position, for different reasons, that Fletcher's main contention need not be addressed in this appeal. We begin by considering these arguments in turn.

### A

█ The court of appeals reasoned that it need not determine whether McKinney owed Cairns a duty as Fletcher contends because McKinney's liability to Cairns can rest simply on the jury's finding that McKinney was negligent. But for McKinney to have been negligent, he must have breached some legal duty. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). The jury's finding of negligence will not support a judgment against McKinney unless he owed Cairns a legal duty that he breached. If McKinney was within his rights in assisting Cairns regardless of her mental competence, then evidence that he helped her transfer her stock despite her incompetence is no evidence of negligence. Contrary to the court of appeals' argument, determining McKin-

ney's legal duty to Cairns is essential and unavoidable.

The same is true of two other liability theories Fletcher asserts—breach of fiduciary duty and employment of a fraudulent, manipulative, or deceptive device. McKinney concedes that he owed Cairns a fiduciary duty but contends that his failure to ascertain her mental capacity did not breach that duty and that there is no evidence of any other breach. Likewise, assuming for the sake of argument that he owed Cairns a duty not to use any device to defraud, manipulate, or deceive her, McKinney contends that not ascertaining Cairns's mental capacity did not breach that duty and that Fletcher offered no evidence of any other breach.

McKinney argues that Fletcher cannot recover on any liability theory she asserts relating to the stock transfers because all share a flawed premise, namely, that he was legally obliged to determine Cairns's mental capacity before assisting her with the stock transfers. There is evidence, although it is disputed, that McKinney made no effort to determine Cairns's mental capacity, but there is no evidence of any other conduct of McKinney that would support recovery on the liability theories Fletcher asserts. Thus, resolving the legal issue whether McKinney owed Cairns a duty to ascertain her mental capacity is essential to the appeal, and the court of appeals erred in reaching a contrary conclusion.

**B**

■ Fletcher argues that McKinney failed to preserve for appeal his contention that he had no duty not to assist Cairns because he did not make this assertion in objection to the charge. But McKinney's complaint on appeal is that no evidence supports the judgment—that is, for example, that evidence that he assisted Cairns in her stock transfer despite her incompetence is no evidence of negligence because it does not prove the breach of any legal duty owed. McKinney argues that assisting an elderly person whose mental capacity may be impaired in making a stock transfer cannot be a basis for liability on any of the several theories Fletcher asserts, and thus evidence that he assisted

Cairns cannot support the judgment against him because it is no evidence of liability. McKinney does not contend that he owed Cairns no duty at all. He concedes that he was obliged to carry out her instructions with ordinary care, and that had he not done so, he would have been negligent. His argument is that there is no evidence of legally prohibited conduct to support the jury's liability findings. An objection to this effect need not be made to the charge. TEX.R. CIV. P. 279 ("A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after verdict...."). McKinney argued that there was no evidence to support the verdict in his motion for judgment *non obstante veredicto* and to disregard jury answers.

McKinney also urged his no-evidence complaint in the court of appeals. As we have already explained, McKinney does not argue that he owed Cairns no fiduciary duty or duty of ordinary care; on the contrary, he concedes he owed her those duties. He contends only that failing to ascertain Cairns's mental capacity did not breach those duties, and that there is no other evidence of any breach. Contrary to Fletcher's argument, McKinney's no-evidence complaint was preserved in the lower courts.

**C**

■ Finally, McKinney argues that we need not determine whether a duty exists as Fletcher contends because there is no evidence that Cairns was mentally incapacitated *at the time of the stock transfers.* Testimony of Cairns's friends and family members about her mental condition at the time, McKinney contends, was merely speculation based on subsequent events and not assessments based on circumstances contemporaneous with the stock transfers. The agreed judgment between Fletcher and Anness in the probate proceeding that included a finding that Cairns lacked testamentary capacity at the time of the transfers should not, McKinney argues, have been admitted. McKinney urges that the only evidence about Cairns's mental state at the time of the transfers was his own assessment that when he met with

her she knew what she was doing. We do not agree. The admissibility of the agreed judgment aside, there is testimony from people who were with Cairns continually before, during, and after the events in question, that Cairns was not competent to make a decision of such consequence as transferring $300,000 worth of securities. There is thus some evidence that Cairns was not competent to decide to transfer her stock to Anness.

That evidence, however, is not conclusive, and the jury was not asked to resolve the dispute. The jury failed to find that Cairns was competent, but it did not affirmatively find that Cairns was incompetent. Thus, Fletcher cannot argue, as she now attempts to do, that McKinney had a duty not only to determine Cairns's competence but to refrain from assisting her with the stock transfers because she was in fact mentally incompetent and McKinney knew it. There are no findings to support her argument.

### III

■ We come, then, to the question whether McKinney owed Cairns a duty to determine her competence. Fletcher argues that this duty is part of a stockbroker's fiduciary responsibility. In dealing with an elderly client, Fletcher contends, a stockbroker is put on notice by the client's age alone that the client may not appreciate the significance of a transaction. Fletcher cites no authority in support of her argument, and we have found none. To the contrary, McKinney cites authority for the proposition that a stockbroker's only duty to a client with a non-discretionary account is to faithfully carry out the client's instructions. *See Puckett v. Rufenacht, Bromagen & Hertz, Inc.,* 587 So.2d 273, 279 (Miss.1991) (surveying other jurisdictions).

■ Fletcher is thus put to arguing that even if the duty has not previously been recognized, it should be recognized in this case. In determining whether a duty should be recognized, we consider "several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Greater Houston Transp. Co.,* 801 S.W.2d at 525. Applying these factors here, we acknowledge that the risk that an elderly person may not appreciate the significance of a stock transaction is neither improbable nor unforeseeable, but this risk must be balanced against the utility of affording an elderly person the same services available without question to younger people. Fletcher does not argue that a stockbroker must assess the competence of all clients, an argument that would be very difficult to maintain, or that stock transactions are especially difficult to understand. There simply is no responsibility on the part of service providers in general or stockbrokers in particular to determine the competence of their clients. Fletcher's argument is limited to elderly clients, and the issue thus becomes the social utility of treating the elderly differently. We believe, on balance, that the risk of injury to an elderly person does not warrant different treatment.

The facts of this case support this conclusion. Fletcher assisted Cairns with her finances for ten years after Cairns's husband's death, even though Fletcher concedes Cairns was quite lucid and competent throughout most of this time period. Fletcher also admits that two months before Cairns transferred her stock to Anness, Fletcher told Cairns that she would no longer be responsible for Cairns's financial affairs, and that Cairns would have to take them over herself. From Cairns's age alone, McKinney had no more reason to deny Cairns services than her bank did not to honor her checks.

Another factor in the duty equation is burden of the duty. Stockbrokers and other service providers cannot be expected to have any expertise in assessing mental capacity. The burden of making this assessment is thus especially great. A service provider should not be put to choosing between refusing to assist an elderly person with legitimate transactions and incurring liability for providing such assistance when the provider lacks any qualification for determining competence. A stockbroker's fiduciary obligation to a client does not include the duty to ascertain the client's mental competence.

Balancing risk of injury against the burden of prevention, we decline to recognize the duty for which Fletcher contends. We be-

lieve the rights of incompetents of whatever age are adequately protected by the rule that voids transactions in which they are involved in some circumstances, *see* RESTATEMENT (SECOND) OF CONTRACTS § 15 (1981), and by the availability of guardianships. In this case, Fletcher knew Anness possessed an annuity purchased with proceeds from the sale of Cairns's stock and yet did nothing to recover it before it was liquidated. The rule protecting incompetents does not afford relief in every situation; it does not afford relief in this case when Fletcher waited until after Anness disposed of the stock before seeking appointment of a guardian for Cairns, even though Fletcher contends that Cairns was incompetent from well before she transferred the stock to Anness. But we believe existing remedies represent a fair balancing of the concerns involved.

Unlike minors, the elderly are not presumptively incompetent, nor, we believe, should they be. Legitimate policy shields minors from the consequences of their agreements solely on account of age without regard to competence; there is no similar policy to shield the elderly merely on account of age. Imposing liability on service providers for dealing with elderly persons discourages such dealings, thereby impairing the elderly's access to services they would unquestionably have if younger. This contravenes sound policy.

■ Fletcher makes one additional argument: that the "know your customer" rule of the New York Stock Exchange and the "suitability" rule of the National Association of Securities Dealers impose a duty on stockbrokers to determine the competence of their clients. NYSE Rule 405 requires members to "[u]se due diligence to learn the essential facts relative to every customer". *See Jablon v. Dean Witter & Co.*, 614 F.2d 677, 678 n. 1 (9th Cir.1980). Section 2 of the NASD Rules of Fair Practice states that "[i]n recommending to a customer the purchase, sale or exchange of any security a member shall have reasonable grounds for believing that the recommendation is suitable for such customer". *See id.* at 678 n. 2. Every court of which we are aware that has addressed an argument like Fletcher's has rejected it. *Id.* at 679–681; *Wasnick v. Refco, Inc.*, 911 F.2d 345, 348 n. 2 (9th Cir.1990); *Lefkowitz v. Smith Barney, Harris Upham & Co.*, 804 F.2d 154, 155 (1st Cir.1986). We agree that these rules cannot be stretched into requirements that stockbrokers ascertain their clients' competence.

We therefore conclude that a stockbroker has no duty to determine a client's competence before assisting the client with a transaction.

Because we do not recognize the duty McKinney is alleged to have breached, McKinney cannot be liable for negligence or breach of fiduciary duty. Four other liability theories of Fletcher's likewise fail. First, McKinney owed Cairns no duty not to deal with Anness and thus cannot be liable for doing so. Second, and more specifically, McKinney owed Cairns no duty to prevent Anness from obtaining an annuity as he did, and thus he cannot be liable for that conduct. Third, no duty of good faith and fair dealing exists in ordinary commercial transactions like the one between McKinney and Cairns. *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 51 (Tex.1998). Thus McKinney cannot be liable for the breach of such a duty. Fourth, there is no evidence of wrongdoing on which to base the jury's conspiracy finding.

A sixth liability theory of Fletcher's—that McKinney "employ[ed] one or more fraudulent, manipulative and/or deceptive devices in connection with [Cairns]"—is also grounded on her assertion that McKinney should have determined Cairns's competence. Because we have concluded that McKinney owed Cairns no such duty, Fletcher is not entitled to recover on this theory.

Thus we conclude that McKinney's liability cannot be based on six of the seven theories asserted by Fletcher and found by the jury. We turn briefly to the last theory Fletcher asserts.

## IV

■ Fletcher asserts, and the jury found, that McKinney "negligently misrepresent[ed] to the court that the [annuity] had been subjected to court orders and/or process prohibiting the disposition of the [annuity]." We agree with McKinney that there is no evidence to support liability on this finding. In response to the writ of sequestration issued

in the guardianship proceeding, McKinney listed the annuity as an asset of Anness's. McKinney in no way suggested that the annuity could not be liquidated. Fletcher examined Anness in the proceeding about the annuity, and it was not until a week later that he liquidated it. Assuming that one may be liable for negligent misrepresentation to a court, there is no evidence of such conduct here.

\* \* \* \* \*

Our holding today does not insulate a stock broker from liability for fraud, nor does it prevent incompetents from having transactions like the one in this case voided. Fletcher has not sought any such relief in this case. For the reasons explained, there is no evidence to support a judgment for Fletcher against McKinney. Consequently, there is also no evidence to support a judgment for Fletcher against Jones & Co. Accordingly, we reverse the judgment of the court of appeals and render judgment that Fletcher take nothing.