Reversed and Remanded and Majority and Dissenting Opinions filed June
29, 2004









Reversed and Remanded and Majority and Dissenting
Opinions filed June 29, 2004.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-02-00518-CV

____________

 

DAVID AND
CAROLYN AXELRAD, Appellants

 

V.

 

DR.
RICHARD JACKSON, Appellee

 

________________________________________________________

 

On Appeal from the 334th District Court

Harris County, Texas

Trial Court Cause No. 99-52855

 

________________________________________________________

 

D I S S E N T I N G   O P I N I O N








In determining the legal
sufficiency of a doctor=s
assertion of his patient=s
contributory negligence, the Texas Supreme Court has asked whether, ignoring
all evidence to the contrary, some evidence indicated the patient may have been
contributorily negligent.  See Elbaor
v. Smith, 845 S.W.2d 240, 243 (Tex. 1992) (stating that A[t]o
determine whether legally sufficient evidence supported [a] contributory
negligence submission, we must examine the record for evidence supporting [the]
question and ignore all evidence to the contrary . . . [i]f we find some
evidence indicating that [the patient] may have been contributorily negligent,
then we must conclude that the trial court [was required to submit the
contributory negligence issue to the jury for its determination]@).  The majority opinion unnecessarily creates a
new legal standard for analyzing contributory negligence issues in professional
malpractice cases.  Under the Elbaor
standard, however, the trial court properly entered judgment in favor of Dr.
Jackson based on the jury=s
contributory negligence findings. 
Because the majority errs in concluding otherwise, I respectfully
dissent.

A.        The majority opinion creates a new legal standard.

The majority holds that trial
courts should not submit questions regarding the contributory negligence of a
patient asserting a misdiagnosis malpractice claim unless the evidence raises a
fact issue as to one or more of the following: 

(1) whether the doctor
asked the patient Aa specific question@ Adesigned@ or Acalculated to elicit@ the Aexact@ information in question,
the patient failed to communicate this information to the doctor, and this
failure to communicate was a proximate cause of the occurrence in question; 

(2) whether the doctor
asked Aappropriate questions
about the patient=s history,@ the patient Ainaccurately or
untruthfully reported his symptoms in response to [the doctor=s] questions,@ and this inaccurate or
untruthful response was a proximate cause of the occurrence in question; 

(3) whether the patient
was Aaware that the treating
physician [had] failed to ascertain some aspect of the patient=s medical history which
the patient [knew involved] a risk of harm to the patient during the course of
future medical treatment@ and the patient failed to
communicate that information to the doctor; or 

(4)
whether the patient knew the doctor was Aunaware
of a condition which imposes a risk of danger to the patient@ and the
patient=s failure
to inform the  doctor of this condition
was Aunreasonable
under the circumstances.@








The majority=s new
legal standard is unduly complicated and difficult to apply.  Furthermore, in many malpractice cases, this
standard will impose new duties on doctors to ask very precise questions of
their patients before the submission of a contributory negligence question.  The majority opinion does base its legal
standard on various cases from other jurisdictions; however, the new legal
standard that the majority creates for Texas makes it unduly difficult to raise
a fact issue as to the contributory negligence of patients.  Requiring physicians to ask specific
questions in excess of those required by the applicable standard of care would
impose unnecessary burdens on the doctor-patient relationship and add
inefficiencies to the healthcare system. 









The applicable standard here is
that used by the Texas Supreme Court in Elbaor.  See Elbaor, 845 S.W.2d at 243.  In reviewing the trial court=s denial
of appellants= motion to disregard jury
findings, we review the record in the light most favorable to the verdict,
considering only the evidence and inferences that support the verdict and
rejecting the evidence and inferences contrary to the verdict.  See Shell Oil Prods. Co. v. Main St.
Ventures, L.L.C., 90 S.W.3d 375, 387 (Tex. App.CDallas
2002, pet. dism=d by
agr.) (stating standard of review for motion to disregard jury findings is the
same as that for motion for judgment notwithstanding the verdict); Rush v.
Barrios, 56 S.W.3d 88, 94 (Tex. App.CHouston
[14th Dist.] 2001, pet. denied) (stating standard of review for motion for
judgment not withstanding the verdict); see also Elbaor, 845
S.W.2d at 243 (applying no-evidence standard of review when trial court refused
doctor=s
proposed question to the jury on contributory negligence).  Applying this familiar standard of review,
this court should simply ask whether there was some evidence at trial
indicating that the contributory negligence of Dr. Axelrad (the patient) was a
proximate cause of the occurrence in question. 
See Elbaor, 845 S.W.2d at 243. 
While Dr. Axelrad=s
contributory negligence may be based on his duty to cooperate with Dr. Jackson,
this does not require the articulation of the complex system of subsidiary
legal rules promulgated by the majority. 
See id. at 243B45;
Carreker v. Harper, 396 S.E.2d 587, 588 (Ga. Ct. App. 1990) (stating, in a
majority opinion,[1]
that A[i]t was
for the jury to determine whether the plaintiff exercised ordinary care for her
own protection, and the record provides adequate facts which support the jury=s finding
of comparative negligence, which was the proximate cause of the damages
complained of@);  Moodie v. Santoni, 441 A.2d 323, 327
(Md. Ct. App. 1982) (stating that, for a patient to be Afree of
contributory negligence, as a matter of law, there must be no evidence of acts
or conduct from which a reasonable mind could find or infer negligence on [his]
part@); Jamas v. Krpan, 568 P.2d 1114, 1115 (Ariz. Ct. App.
1977) (stating, A[o]nly where no reasonable evidence of contributory
negligence has been presented can the trial court refuse to instruct the jury
on the defense of contributory negligence@).

B.        The trial court properly entered
judgment in favor of Dr. Jackson based on the jury=s contributory negligence
findings. 

A review of the record shows that
under the Elbaor standard specified above, the trial court properly
entered judgment in favor of Dr. Jackson based on the jury=s
contributory negligence findings.[2]  

1.         Procedural Posture of
this Case








I begin
by briefly noting the context of this case and the procedural posture in which
it comes to us.  Dr. Axelrad filed suit
against Dr. Jackson for medical malpractice, alleging Dr. Jackson misdiagnosed
his diverticulitis and, consequently, negligently prescribed an enema.  At trial, Dr. Jackson argued that Dr. Axelrad
was negligent in failing to give a full and complete history of his medical
condition, including the genesis of his pain and his history of bowel problems.[3]  The question submitted to the jury, without
objection, was: ADid the
negligence, if any, of those named below proximately cause the occurrence in
question?@ 
Dr. Axelrad and Dr. Jackson were both listed following the
question.  The jury was also instructed
that Anegligence@ when
used with respect to Dr. Axelrad=s conduct
meant: 

failure to use ordinary
care, that is, failing to do that which a person of ordinary prudence would
have done under the same or similar circumstances or doing that which a person
of ordinary prudence would not have done under the same or similar
circumstances.

 

The charge also instructed the jury as to the
meaning of Aordinary care@[4] and Aproximate
cause@[5] as it
related to Dr. Axelrad=s
conduct.  The jury found Dr. Jackson 49%
negligent and Dr. Axelrad 51% negligent and thus, concluded that in failing to
disclose his prior medical history and symptoms, Dr. Axelrad was contributorily
negligent in the alleged misdiagnosis. 








On appeal, Dr. Axelrad lists
several issues for our consideration regarding a patient=s legal
duty to communicate his medical history to his treating physician.[6]  In addressing these issues, the majority
imposes new duties on doctors to ask very specific questions of their patients
before a contributory negligence question can be submitted.[7]  However, the issues as presented by Dr.
Axelrad are not before us.  








Though the existence of a
legal duty is a threshold question in a negligence action, Texas jurisprudence
already recognizes that a patient has a legal duty to cooperate with his
treating physician.  See Elbaor,
845 S.W.2d at 245.  Indeed, Dr. Axelrad
acknowledges the existence of a duty in his brief, stating his Aduty was
to truthfully and to the best of his ability answer [Dr. Jackson=s]
questions.@ 
Moreover, the extent of Dr. Axelrad=s duty
was set forth in the jury charge.[8]  Cf. Shah v. Moss, 67 S.W.3d 836, 844
(Tex. 2001) (noting that the standard of care defined the duty owed).  Because there was no objection to the charge,
there is no need to flesh out the parameters of the duty in this case as the
majority has done.[9]  Instead, the issue the court must decide is
whether there was legally and factually sufficient evidence that Dr. Axelrad
was contributorily negligent in this misdiagnosis case.[10]  Compare Lozano v. Lozano, 52 S.W.3d
141, 145 (Tex. 2001) (examining sufficiency of the evidence in light of the
unobjected to jury charge), with Edward D. Jones & Co. v.
Fletcher, 975 S.W.2d 539, 542B43 (Tex.
1999) (finding complaint, that there was no evidence of breach of duty, is a
legal sufficiency challenge as to which error may be preserved by motion for
judgment notwithstanding the verdict or to disregard jury findings), and
Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist., 987 S.W.2d
50, 52 (Tex. 1998) (acknowledging that a motion to disregard preserves a
no-evidence point on appeal).  We must
determine, under the circumstances of this case, whether there is sufficient
evidence to support the jury=s
conclusion that Dr. Axelrad failed to cooperate with Dr. Jackson in diagnosing
his illness as a person of ordinary prudence would have done under the same or
similar circumstances.[11]  

2.         Sufficiency Analysis








In reviewing the trial court=s denial
of appellants= motion to disregard jury
findings, this court applies a no-evidence standard of review.  See Shell Oil Prods.  Co. v. Main St. Ventures, L.L.C., 90
S.W.3d 375, 387 (Tex. App.CDallas
2002, pet. dism=d by
agr.) (citing Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227
(Tex.1990)).  Thus, our standard of
review in this appeal is deferential to the jury=s
findings.  If the record contains any
evidence of probative force to support those findings, the legal insufficiency
challenge must be overruled. PricePfister, Inc. v. Moore & Kimmey, Inc.,
48 S.W.3d 341, 347 (Tex. App.CHouston
[14th Dist.] 2001, pet. denied).  

When reviewing a no‑evidence
issue, we consider all of the evidence in the record in the light most
favorable to the jury=s verdict
and we apply every reasonable inference that could be made from the evidence in
its favor; we disregard all evidence and inferences to the contrary.  Merrell Dow Pharms., Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997).  No
evidence exists when the record discloses one of the following: (1) a complete
absence of a vital fact; (2) the court is barred by rules of law or evidence
from giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a scintilla of evidence;
or (4) the evidence establishes conclusively the opposite of a vital fact.  Rush, 56 S.W.3d at 94.  If there is more than a scintilla of evidence
to support the jury=s
findings, then the trial court correctly denied the motion to disregard the
jury=s
findings.  See id.  More than a scintilla of evidence exists when
the evidence supporting the finding, as a whole, rises to a level that would
enable reasonable and fair‑minded people to differ in their
conclusions.  Havner, 953 S.W.2d
at 711.  A jury=s finding
may be upheld on circumstantial evidence as long as it may fairly and
reasonably be inferred from the facts.  Lozano,
52 S.W.3d at 145.  Further, each piece of
circumstantial evidence must be viewed in relation to all known circumstances
and not in isolation.  Id. at 149.


3.         A Patient=s
Contributory Negligence Under Texas Law 








As the majority correctly
acknowledges, Texas courts allow a jury to consider a patient=s
contributory negligence in malpractice cases. 
The patient=s
contributory negligence must have been an Aactive
and efficient contributing cause of the injury made the basis of the patient=s claim.@  Sendejar v. Alice Physicians &
Surgeons Hosp., Inc., 555 S.W.2d 879, 885 (Tex. Civ. App.CTyler
1977, writ ref=d n.r.e.).  Further, it must be Asimultaneous
and co-operating with the alleged fault of the defendant, must have entered
into the creation of the cause of action and must have been an element in the
transaction which constituted it.@  Id. 
As noted, Texas law also recognizes that a patient has a legal duty
to cooperate with the treating physicians who assume the duty to care for
them.  Elbaor, 845 S.W.2d at 245.

Generally, in assessing a patient=s
contributory negligence, a jury may evaluate the patient=s conduct
without medical or expert testimony.  Isern
v. Watson, 942 S.W.2d 186, 201 (Tex. App.CBeaumont
1997, pet. denied).  The patient is held
to the standard of ordinary care, that is, the care of a person of reasonable
prudence under the same or similar circumstances.  Id. 
In deciding a patient=s
contributory negligence, the trier of fact may consider Acommon
experience of mankind,@ to
determine the care and diligence an ordinary, prudent person would use to
prevent injuries under the circumstances of the case.  Id. 
Moreover, a jury is given wide latitude in allocating responsibility
under the comparative responsibility statute. 
See N. Am. Van Lines, Inc.  v.
Emmons, 50 S.W.3d 103, 126 (Tex. App.CBeaumont
2001, pet. denied).  








In a misdiagnosis case, the
plaintiff must prove both a mistake in professional judgment and that the
mistake was negligent.[12]  Robinson v. Weaver, 550 S.W.2d 18, 21
(Tex. 1977).  Therefore, Dr. Axelrad=s
contributory negligence must have occurred in connection with Dr. Jackson=s
exercise of his professional judgment and the resulting treatment.  See Sendejar, 555 S.W.2d at 885
(noting that any alleged contributory negligence in a medical malpractice case
must be a contributing cause of the injury made the basis of the plaintiff=s
claims); see also Kerby v. Abilene Christian College, 503 S.W.2d 526,
528 (Tex. 1973) (stating that contributory negligence requires a causal
connection with the incident causing injury that but for the conduct the
accident would not have happened). 
Consequently, on review, we must examine the record to see if there is
any evidence that Dr. Axelrad breached his duty to cooperate with Dr. Jackson
in diagnosing his diverticulitis, as a person of ordinary prudence would do in
those circumstances, and whether the breach proximately caused Dr. Axelrad=s injury.[13]  If there is any evidence that Dr. Axelrad
failed to act as a person of ordinary prudence under the circumstances, we
should uphold the jury=s
verdict.  

Having framed our inquiry, the
record reveals sufficient evidence to support the jury=s
findings that the contributory negligence of Dr. Axelrad was a proximate cause
of the occurrence in question.[14]  There was legally sufficient evidence of the
following at trial:

(1)       Dr. Axelrad=s pain originated in the
left lower quadrant of his abdomen;[15]

(2)       When Dr. Axelrad presented to Dr.
Jackson, Dr. Jackson asked him where his discomfort was and questioned him
about his discomfort and what was happening;

(3)       Dr. Axelrad did not tell Dr. Jackson that
his pain originated in the left lower quadrant of his abdomen, nor of his
relevant medical history;

(4)       A classic symptom of diverticulitis is
pain in the lower left quadrant of the abdomen;[16]








(5)
      Had Dr. Jackson known of Dr. Axelrad=s lower left quadrant pain
and pertinent medical history, he would have treated Dr. Axelrad differently
and would not have prescribed the enema.

From this evidence the jury could reasonably
infer that pain in the lower left quadrant of the abdomen is significant to a
correct and timely diagnosis of diverticulitis and Dr. Axelrad=s failure
to tell Dr. Jackson that his pain originated in this area was a proximate cause
of the delay in diagnosing the diverticulitis.[17]  Thus, there is legally sufficient evidence to
support the trial court=s
submission of Dr. Axelrad=s
contributory negligence to the jury.[18]


4.         Evidence of Dr. Axelrad=s
Contributory Negligence 

During the course of the jury
trial, there was a significant amount of testimony regarding Dr. Axelrad=s medical
history, his symptoms during the several days he presented to Dr. Jackson, and
his subsequent care after going to the emergency room.  

From the beginning of trial, Dr.
Axelrad=s
credibility was placed before the jury. 
The jury was made aware that Dr. Axelrad=s version
of the circumstances surrounding the alleged misdiagnosis differed from Dr.
Jackson=s
version, as well as from Dr. Axelrad=s own
deposition testimony.  Specifically, the
jury was made aware of discrepancies in the evidence regarding the history of
Dr. Axelrad=s visits to and communications
with Dr. Jackson prior to 1997.  On
direct examination, Dr. Axelrad testified that from 1991 through 1997, he
remembered seeing Dr. Jackson on at least one occasion, and perhaps on two
occasions.  On cross-examination,
however, it was revealed that Dr. Axelrad stated in his deposition he saw only
one doctor from 1991 through 1997, and indicated the visit involved a doctor
connected








to an insurance matter, a doctor other than
Dr. Jackson.[19]  Dr. Jackson testified that he had not seen
Dr. Axelrad as a patient from 1991 through 1997.

The testimony regarding the
information Dr. Axelrad communicated to Dr. Jackson concerning his health was
also contradictory.  On direct
examination, in describing his symptoms to Dr. Jackson, Dr. Axelrad testified
numerous times that he told Dr. Jackson of an acute onset of pain on Sunday
evening beginning in his Aleft
lower quadrant,@ which
became diffuse early Monday morning. 
However, during cross-examination, the following exchange occurred
regarding the events leading up to the alleged misdiagnosis:  

Q.  That=s what you told BB when you called Dr.
Jackson the next day on the 18th, you told him you are having some flu-like
problems, didn=t you?

A.  Yes. He and I discussed that on that day.

Q.  Now, when you started off your testimony
earlier today, you said that it began as left lower quadrant pain, then became
diffuse.  Do you remember telling us all
that?

A.  Correct, yes.

Q.  And you said under sworn testimony earlier
today that you told Dr. Jackson that on Monday morning, the 18th.  Do you remember telling us that?

A.  Yes.

Q.  That is a different story, isn=t it, Dr. Axelrad, than
you told me under sworn testimony at the time of your deposition?  Isn=t that right?








* * * * 

Q.  Doctor, I asked you: What did you tell Dr.
Jackson when you called him that Monday morning?  

* * * * 

A.  That my problems had returned.  I had abdominal pain.  I had diarrhea, occasional episodes of
diarrhea on Sunday, that I had BB and I took my temperature that morning and it was
100.6.  I told him I had a mild
temperature and I was having abdominal pain.  


Dr. Axelrad=s
deposition testimony suggested he informed Dr. Jackson he was experiencing
cramping pain in his abdomen and other flu-like symptoms, and evidences he
failed to advise Dr. Jackson that he was experiencing pain in his lower left
quadrant.[20]  At that point in the trial, after reviewing
his contrary deposition testimony, Dr. Jackson=s counsel
asked Dr. Axelrad if diffuse abdominal pain was a symptom associated with
diverticulitis, and Dr. Axelrad acknowledged that a classic symptom of
diverticulitis is lower left quadrant pain.[21]









In addition to this testimony,
there was further evidence that lower left quadrant pain is a telling symptom
of diverticulitis.  Dr. Dobbs described
the classical presentation of diverticulitis as complaints of severe abdominal
pain, primarily in the lower left quadrant, fever and a change in bowel
habits.  Indeed, Dr. Dobbs testified that
the only way to make a diagnosis with any sense of confidence was if the
patient presented with lower left quadrant pain, tenderness by physical touch,
and fever.  Dr. Axelrad=s
brother, a urologist, testified as follows: AIf you
were to come into my office with left lower quadrant pain and tenderness, all
right, and someone said you had a urinary tract infection and I did my physical
examination and you were tender, left lower quadrant, that=s simple
diverticulitis.@  Dr. Jackson also testified that the Aclassical
signs and symptoms@ of
diverticulitis were pain in the lower left quadrant of the abdomen and
difficulty with bowel movements.  This is
some evidence that lower left quadrant pain is significant to a correct
diagnosis of diverticulitis and the jury could reasonably infer that had Dr.
Axelrad communicated that symptom to Dr. Jackson, a prompt and correct
diagnosis may have been made. 

In addition to this evidence, Dr.
Jackson testified as to proximate cause.[22]  Dr. Jackson testified that Dr. Axelrad never
mentioned he had been experiencing abdominal problems for some time nor that he
was having pain in his lower left quadrant.  
Specifically, the following was elicited at trial:

Q.        Could any of his large time in the
hospital and the significant treatments that he underwent, could any of those
have been reduced if there had been a punctual diagnosis B 

* * * *

Q.
       B of diverticulitis?

A. (Dr. Jackson)  We=re speculating that=s possible.

* * * * 

A.
       It is possible that if I had had
the information that I have now, we would have treated him differently. 

* * * * 

Q.        You would not have ordered an enema?

A.        That=s true.

* * * * 

A.
       It depends on the constellation of
symptoms.  He presented with the symptoms
that looked like viral disease to me. . . . If he had presented with specific
signs and symptoms of peritoneal irritation, diverticulitis, which include
fever, lower abdominal left lower quadrant pain, constipation, I would have
looked at this very differently.

Q.        Well B 








A.
       If I had known that he had diverticulitis
or an inflammatory condition for a long time in the past, even before he
presented to me, I certainly would have taken a different tact.

* * * * 

A.        Well, if I had received telephone calls
from Dr. Axelrad about abdominal pain, he would have been in my office; and I
would have examined him.  He would have
already had either a barium enema or a colonscopy and would have known about
his rather severe condition B  

According to Dr. Jackson=s
testimony, Dr. Axelrad=s Along-standing
disease in his colon, which [Dr. Axelrad] had not had ever evaluated@ was
evidenced by the pathology report, which indicated fibrous tissue in the colon.[23]  Dr. Reardon=s
operative report also reflected that the perforation in Dr. Axelrad=s colon
had some scar tissue associated with it. 
Dr. Jackson testified that if he had Aall the
pieces of the puzzle put together,@ he would
not have recommended the enema because it was not Astandard
treatment for diverticulitis.@  Importantly, there is also evidence that when
Dr. Jackson became aware of Dr. Axelrad=s
additional medical history indicating these long-standing bowel problems, on
Tuesday morning following Dr. Axelrad=s
hospitalization, Dr. Jackson felt a CT scan was necessary and ordered the test
done at that point.  Ultimately, Dr.
Axelrad=s
diverticulitis was revealed on the CT scan.[24]  Thus, this is further evidence from which the
jury could have reasonably found that had Dr. Axelrad disclosed his history of
bowel problems, the diverticulitis may have been accurately diagnosed and the
enema would not have been prescribed.   








At trial, Dr. Axelrad testified
he had seen a doctor for rectal bleeding in 1994.  That doctor, Dr. Earle, performed a
proctoscope, a procedure which Dr. Axelrad admitted was something most people
do not forget.  When questioned by Dr.
Jackson=s
attorney, however, as to why he failed to disclose the visit to Dr. Earle
during his deposition, Dr. Axelrad simply stated he had forgotten about
it.  When asked whether he had informed
Dr. Jackson about the proctoscope in August of 1997, Dr. Axelrad testified that
he neglected to inform Dr. Jackson of this procedure stating, ANo.  I don=t recall
telling him about Dr. Earle.  I told Dr.
Dobbs[25]
the next morning.@  

Dr. Axelrad also acknowledged
that Dr. Earle=s records indicated he had
recommended Dr. Axelrad return in 24 months for a colonscopy,[26]
but testified during his deposition that no one had recommended a colonscopy
prior to his treatment by Dr. Jackson in August 1997.  Regarding this discrepancy in his testimony,
the following exchange occurred: 

Q.        And in response also to the earlier questions about the
colonscopy, you talked about how you didn=t hide this from anybody,
that it was in Dr. Dobbs= records.  That=s the whole reason why I
asked you in your deposition before August of 1997: Had anybody ever
recommended a colonscopy? And in you sworn deposition testimony taken years
after the hospitalization, you said nobody had recommended one, didn=t you?

A.        I didn=t remember to state that,
Mr. Sprott.

Q.        You didn=t remember it?  It is in the hospital record.

A.        Mr. Sprott, I didn=t review the hospital
record before I was deposed. 

Q.        I see.  So, another
mistake, correct?








The jury was also aware that the
information concerning a colonscopy may have contributed to an accurate
diagnosis.  Indeed, Dr. Kanner, Dr.
Axelrad=s own
expert witness, testified that a colonscopy is important information in making
a diagnosis of diverticulitis, stating it would be Auseful to
know.@  Dr. Sollenne, Dr. Jackson=s expert
witness, also testified that the recommendation would have Abeen
useful in forming a differential diagnosis.@  This is some evidence that Dr. Axelrad failed
to communicate this pertinent medical history to Dr. Jackson, and had he
communicated it, a correct diagnosis may have been made.   

Also, although Dr. Axelrad did
not disclose his history of bowel problems to Dr. Jackson during his initial
presentation, he had told Dr. Dobbs of Aone
episode of bleeding approximately one and one half years ago and a proctoscope
was done and was within normal limits.@  Dr. Reardon=s notes
also indicated Dr. Axelrad had a history of Aintermittent
cramps and diarrhea over many months.@  In addition, there was evidence that although
Dr. Axelrad had seen Dr. Earle in 1994, this information was never provided to
Dr. Jackson as Dr. Axelrad=s primary
physician, though there was a note in Dr. Jackson=s records
indicating that Dr. Axelrad had seen a neurologist during those six years.  This, too, is evidence that Dr. Axelrad
neglected to inform Dr. Jackson of this pertinent medical history.

There was also evidence that Dr.
Jackson obtained a medical history from Dr. Axelrad.  Dr. Jackson testified that when he first sees
a patient, he takes a history and asks the patient what is Ahappening
to them.@  Dr. Jackson also testified that when taking a
history from a patient, he Aroutinely@ asks the
patient about any other medical problems they may have experienced since their
last visit.  From this, the jury could
have reasonably inferred that Dr. Jackson asked questions which afforded Dr.
Axelrad the opportunity to respond, disclosing both his pain and his history of
bowel problems, facts which a reasonable and prudent person would disclose
under the circumstances and facts necessary to make an accurate diagnosis.     








Finally, Dr. Dobbs testified: A[m]ost
patients who present with acute diverticulitis will complain of severe
abdominal pain, primarily in the left lower quadrant . . . .,@
indicating that an Aordinary@ patient
would have both left lower quadrant pain and would communicate that fact to his
physician.[27]     

In sum, based on a review of the
evidence supporting the adverse finding of contributory negligence, I would
conclude that Dr. Axelrad=s name
was properly included in the comparative fault question and further, that there
is sufficient evidence to support the jury=s
findings regarding his contributory negligence. 
See, e.g., Sloan v. Molandes, 32 S.W.3d 745, 752B53 (Tex.
App.CBeaumont
2000, no pet.) (holding the evidence was sufficient to support the jury=s finding
that a patient was contributorily negligent); see also Carreker,
396 S.E.2d at 588 (holding that trial court properly charged jury as to patient=s
contributory negligence in failure-to-diagnose case because evidence raised
fact issue as to whether patient failed to fully disclose certain symptoms and
medical history relevant to her condition when she was examined by the
defendant);  Fall v. White, 449 N.E.2d 628, 632B33 (Ind. Ct. App. 1983)
(acknowledging that a patient does not have a duty to diagnose his own
condition, but upholding verdict because there was sufficient evidence that
showed plaintiff had failed to follow the doctor=s instructions and to give complete
and accurate information); Moodie v. Santoni, 441 A.2d 323, 327 (Md.
Ct. App. 1982) (finding sufficient evidence to warrant contributory negligence
question to jury in medical malpractice case). 








Although a doctor has specialized
knowledge to diagnose an illness, the diagnosis is often based on the exchange
of information between the patient and his physician.  The patient is in a better position to know
exactly what his current symptoms are and his pertinent medical history.  While a patient does not have a duty to
diagnose his own illness, the patient does have a duty to cooperate with his
treating physician.  See Elbaor,
845 S.W.2d at 245.  For his own safety, a
patient must exercise ordinary care in cooperating with his treating
physician.  Patient conduct in
communicating symptoms and medical history that violates the standard of care,
that is, to cooperate with his physician as an ordinary and prudent person
would do under the same or similar circumstances, may result in a finding of
contributory negligence.[28]  See Carreker, 396 S.E.2d at 588; Moodie,
441 A.2d at 327; Jamas, 568 P.2d at 1115; cf. Gen.
Motors Corp. v. Sanchez, 997 S.W.2d 584, 594B95 (Tex.
1999) (noting in a products liability case, that although a consumer has no
duty to discover a product defect, the consumer=s conduct
other than failure to discover is subject to comparative responsibility).








Though no Texas cases have directly addressed this issue,
other states recognize the defense of contributory negligence where a patient
fails to disclose all or part of his medical history to the defendant physician.  For example, in Oxford v. Upson County
Hosp., Inc., 438 S.E.2d 171, 171 (Ga. Ct. App. 1993), the patient, an adult
woman, was diagnosed with gastroenteritis and mild dehydration and was admitted
to the hospital.  Id.  Her physician[29]
was aware that she had experienced dizziness prior to her admission, but the
patient failed to inform anyone else of these symptoms; there was nothing in
the patient=s chart indicating she was unable to
get out of bed or that she had been dizzy and lightheaded, and the patient did
not inform the nurse that she experienced those symptoms.  Id. at 172.  When the patient told the nurse she needed
to use the restroom, the nurse assisted her to the room and stood close by;
however, while in the restroom, the patient fainted, striking her head on the
wall.  Id.  The appellate court upheld the trial
court=s decision to charge the jury on issues
of causation, failure to exercise ordinary care, and comparative negligence,
holding that the patient was required to inform the professionals of her
symptoms so they could exercise their professional judgment.  See id. at 171B72. 
While some out-of-state authority supports the propositions stated in
the majority opinion, taken together, these statements do not provide a clear
and workable rule of contributory negligence for Texas professional negligence
cases.

5.         Conclusion 

The majority crafts an unwieldly
and imprudent legal standard for determining the legal sufficiency of the
evidence of contributory negligence in professional malpractice cases.  A better legal standard would be to determine
whether, in light of the patient=s duty to
cooperate with his treating physician, there was some evidence at trial
indicating that the contributory negligence of the patient was a proximate
cause of the occurrence in question. 
Under this proper standard, there is sufficient evidence to support the
jury=s
contributory negligence findings. 
Accordingly, the trial court=s
judgment should be affirmed, and I respectfully dissent.

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered
and Majority and Dissenting Opinions filed June 29, 2004.

Panel consists of
Justices Anderson, Seymore, and Guzman. 
(Seymore, J., majority).

 











[1]  The majority
erroneously states that the Carreker opinion is a plurality
opinion.  See Carreker, 396 S.E.2d
at 589.  While the majority is correct
that four judges on the court concurred, the majority overlooks the fact that
these judges concurred in the presiding judge=s
opinion, not just the judgment.  See
id.  Therefore, this opinion is a
five-judge majority, not a one-judge plurality. 
See id.    





[2]  The majority
correctly finds that, on this record, Dr. Axelrad=s
inattention to his own health care is not contributory negligence. 





[3]  In its
analysis, the majority focuses only on whether Dr. Axelrad revealed lower left
quadrant pain and Dr. Earle=s recommendation that Dr. Axelrad have a
colonscopy.  However, Dr. Jackson=s argument is properly stated above.  Also, there was some evidence that Dr.
Axelrad failed to provide other information to Dr. Jackson.  For example, Dr. Axelrad testified that he
failed to inform Dr. Jackson of the proctoscopy performed on him in 1994, when
he saw Dr. Earle for rectal bleeding, as well as Dr. Earle=s recommendation. 
In addition, Dr. Jackson testified that during his initial telephone
call to Dr. Jackson, Dr. Axelrad did not communicate that he had severe
abdominal pain or a low grade fever. 
During his August 19 office visit, Dr. Jackson=s notes indicate that Dr. Axelrad did not complain of
nausea or abdominal pain Aexcept with certain movements, . . . .@





[4]  A>Ordinary care,= when
used with respect to the conduct of David Axelrad, means that degree of care
that a person of ordinary prudence would use under the same or similar
circumstances.@  





[5]  A>Proximate cause,= when
used with respect to the conduct of David Axelrad, means that cause which, in a
natural and continuous sequence, produces an event, and without which cause
such event would not have occurred.  In
order to be a proximate cause, the act or omission complained of must be such
that a person using ordinary care would have foreseen that the event, or some
similar event, might reasonably result therefrom.  There may be more than one proximate cause of
an event.@    





[6]  Specifically,
Dr. Axelrad questions: ADoes a patient have a legal duty to (i) know which
facts in his medical history are relevant to his diagnosis and treatment and
(ii) volunteer all such facts to the physician when he presents for treatment,
or is it the physician=s duty to ascertain the relevant medical history by questioning
the patient?@ and AWhen a physician doesn=t ask
about a particular aspect of the patient=s medical
history, and the patient doesn=t volunteer such information, and there is no evidence
that the patient intentionally withheld information that he knew was relevant
to his diagnosis and treatment, is the patient=s
failure to volunteer such information comparative negligence that will reduce
or bar his recovery in a medical malpractice?@





[7]  The majority
contends that on review, we must determine Awhether
there is legally sufficient evidence . . . that Axelrad breached the duty . . .
in responding or failing to respond to inquiries regarding his medical history.@  In framing the
inquiry in this manner, the majority adopts too narrow an approach, resulting
in new duties on doctors to ask very precise questions of their patients before
the submission of a contributory negligence question.  Further, although this statement suggests the
majority conducts a legal sufficiency analysis, their review of the evidence is
limited to whether Dr. Jackson asked a specific question calculated to elicit
the information in question.  





[8]  In this case, the jury was
instructed BB without objection BB to evaluate Dr. Axelrad=s conduct in accordance
with the ordinary standard of care used in Isern v. Watson, 942 S.W.2d
186, 201 (Tex. App.CBeaumont 1997, writ
denied).  See also Moodie v. Santoni, 441 A.2d 323, 327 (Md. Ct.
App. 1982) (noting that contributory negligence is to be measured by the
standard of care of an ordinarily prudent person under the same or similar
circumstances).  In Moodie, the
court noted that Awhat an ordinarily prudent and careful person would do
under a given set of circumstances is usually controlled by the instinctive
urge of one to protect himself from harm.@  Moodie, 441 A.2d at 325.  





[9]  Although there
was no objection to the charge, Dr. Axelrad did preserve error regarding the sufficiency
of the evidence supporting the jury=s
contributory negligence findings by asserting a motion to disregard the jury=s findings.  See
Rocky
Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist., 987 S.W.2d 50, 52 (Tex.
1998).    





[10]   Notably,
although the majority correctly acknowledges it must conduct a legal
sufficiency review BB in which we only consider the evidence in support of
the jury=s verdict BB
the majority does otherwise.  For
example, in response to evidence relied on as support for the jury=s verdict in this dissent, the majority cites to
record evidence it claims reflects that after reviewing the CT scan results, ADr. Jackson=s
impression was >diagnosis probably not diverticulitis.=@  Moreover, in
its factual recitation, the majority describes Dr. Axelrad=s reaction to the enema as follows: AAxelrad fell to the floor vomiting. . . .  Frightened, Axelrad=s wife first called Dr. Jackson, who urged them to
administer the second enema.  She chose
not to follow Dr. Jackson=s recommendation. 
Instead, she immediately transported her husband to the emergency room.@  Although this
is an accurate recitation of Dr. Axelrad=s
testimony, his wife testified slightly differently, stating that after Dr.
Axelrad administered the enema to himself he Aall of a
sudden, came out [of the bathroom], just barely walking out of the bathroom,
was throwing up . . .  Well he got to the
bed.  Once he got to the bed, he started
shaking . . . .@  Also, Dr.
Jackson testified that he was the one who recommended that Dr. Axelrad go to
the hospital at that point.





[11]  Prior to
examining the evidence, we should properly frame our inquiry.  See Golden Eagle Archery, Inc. v. Jackson,
116 S.W.3d 757, 762 (Tex. 2003).





[12]  Of course, it
was Dr. Jackson=s burden to establish Dr. Axelrad=s contributory negligence.  See Kroger v. Keng, 23 S.W.3d 347, 351
(Tex. 2000).





[13]  Contrarily,
the majority concentrates its examination of the evidence on whether Dr.
Jackson asked a specific question of Dr. Axelrad.  However, this approach presupposes that a
patient=s duty to cooperate includes only the duty to respond
to specific queries.





[14]  The majority
contends my analysis involves both an impermissible stacking of inferences and
unreasonable inferences.  However, some
of the evidence in this case is circumstantial and therefore, we examine that
evidence in light of what may be reasonably inferred from it.  The record evidence, as the majority agrees,
speaks for itself.  AIf circumstantial evidence will support more than one
reasonable inference, the jury must decide which is more reasonable, . . . .@  Lozano,
52 S.W.3d at 148.  Indeed, a fact
finder often chooses between opposing reasonable inferences and the choice may
be influenced by the fact finder=s
conclusions on credibility.  Id.
at 149.  A jury is entitled to consider
the circumstantial evidence, weigh the witnesses=
credibility, and make Areasonable inferences from the evidence it chooses to
believe.@  Id. 





[15]  In addition to
Dr. Axelrad=s trial testimony to this effect, appellants asserted
this in the statement of facts in their opening brief on appeal, and Dr.
Jackson did not contradict this fact in his brief.  Therefore, this court should accept this
statement as true.  See Tex. R. App. P. 38.1(f).  





[16]  The majority
stresses the lack of evidence that Dr. Axelrad knew of the significance
of this pain.  Although that knowledge
may be relevant to Dr. Axelrad=s duty as defined by the majority in its analysis,
because lower left quadrant pain is a classic symptom of diverticulitis, under
my analysis, it is evidence that had Dr. Jackson known of this pain, he could
have made a more accurate diagnosis.  





[17]  As noted,
there was evidence of other symptoms and history which was not communicated to
Dr. Jackson.  See supra note
4.  However, because the majority and the
parties primarily focus their arguments on this symptom and medical history, my
analysis does so as well.  





[18]  Applying the
standard of review for factual sufficiency also shows that the jury=s contributory negligence findings are supported by
factually sufficient evidence.  See In
re C.H., 89 S.W.3d 17, 25 (Tex. 2002); Cain v. Bain, 709 S.W.2d 175,
176 (Tex. 1986).   





[19]  When asked if he saw Dr.
Jackson during the period from 1991 through 1997, prior to the onset of his
symptoms which are the subject of this lawsuit, Dr. Axelrad claimed he believed
he had seen him once or twice, relying on a notation on a medical record of a
doctor assigned to examine him in relation to an insurance policy in 1996.  The notation indicated that Dr. Axelrad had
seen Dr. Jackson in 1993.  On
cross-examination, it was established that the notation resulted from a medical
history provided by Dr. Axelrad. 
Further, an additional notation in the record, stating Ablood stool negative,@ indicated the visit in
1993 was in relation to a problem with bloody stools.  When asked if Dr. Axelrad had seen Dr.
Jackson because of a bloody stool problem, Dr. Axelrad said no, that was in
relation to another exam.  Upon further
questioning, it appeared Dr. Axelrad may have indicated to the insurance doctor
that he saw Dr. Jackson in 1993, when he was actually referring to a 1994 visit
with Dr. Edward Earle, a colorectal surgeon, whom he saw for rectal bleeding.  





[20]  Dr. Reardon=s and Dr. Dobbs=s notes also failed to
reflect that Dr. Axelrad had communicated any lower left quadrant pain. 





[21]  Notably, Dr.
Axelrad testified both as a patient and as a physician.  He introduced himself as a physician,
described his medical training B among other things, he had worked as an emergency
room physician for five years B and was even offered as an expert. 





[22]  The majority
acknowledges that the record evidence reflects some causal connection: ADr. Jackson relied on the information volunteered by
[Dr.] Axelrad.@





[23]  Specifically, it was noted
in the pathology report that Dr. Axelrad had Aacute and chronic
diverticulitis.@ 





[24]  Dr. Jackson
testified that the diverticulitis Ashowed
up@ on the CT scan. 
Dr. Reardon stated, A[a] CT scan had been done when I saw him, because I
had written that the CT scan shows possible diverticulitis, . . . .@ Dr. Dobbs also noted that Dr. Reardon=s notes described the CT scan as indicating
diverticulitis.  





[25]  Dr. Dobbs was
one of Dr. Axelrad=s treating physicians at the hospital.  Dr. Axelrad stated he continued to see Dr.
Dobbs as his patient . 





[26]  There was
testimony that if a colonscopy is done and nothing is found and no polyps are
removed, the procedure should be done again every five years.





[27]  The majority
lists items of Adirect evidence@ in the
record that allegedly refute any claim that there is evidence to support a
reasonable inference Dr. Axelrad understood the diagnostic significance of
lower left quadrant pain.  From this
statement, it is evident the majority misconstrues my analysis, which does not
depend on whether Dr. Axelrad knew of the significance of that symptom.  However, even assuming that the majority had
correctly construed my analysis, the fact that Dr. Axelrad learned, after going
to the hospital, that he had diverticulitis, is not direct evidence that
he neglected to fully disclose his symptoms and pertinent medical history; it
is merely a clinical diagnosis. 
Moreover, Dr. Axelrad did not Adiagnose@ himself as having a Acondition
called >rebound.@  ARebound@ is, as defined in the record, a physical finding or
symptom.  It is not a Acondition.@  This, then is merely direct evidence that Dr.
Axelrad erroneously communicated the symptom of rebound.       





[28]  In response to
the majority, a Acomatose patient@ is not
an ordinary and prudent person capable, at the moment, of cooperating with his
treating physician.  





[29]   The physician
was not a defendant in the case.