David and Carolyn AXELRAD, Appellants

v.

**Dr. Richard JACKSON, Appellee.**

No. 14–02–00518–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 29, 2004.

Rehearing Overruled Aug. 26, 2004.

Darrin Walker, Kingwood, for appellants.

Erin E. Lunceford, Joel Randal Sprott, Houston, for appellee.

Panel consists of Justices ANDERSON, SEYMORE, and GUZMAN.

## OPINION

CHARLES W. SEYMORE, Justice.

In this appeal, we determine whether a patient, in recounting his or her medical history, may be assessed comparative negligence in a medical malpractice suit. We hold that a patient's name may be submitted in comparative fault jury questions based on the patient's response to queries regarding medical history. Because there is no evidence of a query designed to elicit the information that appellant, David Axelrad, allegedly failed to communicate, no evidence supports appellee, Dr. Jackson's contention that David Axelrad had a duty to volunteer the information. Accordingly, it was error to submit David Axelrad's name in the comparative negligence jury questions. We reverse and remand for a new trial.

## I. FACTS

On Sunday evening, August 17, 1997, David Axelrad, a psychiatrist, began feeling flu-like symptoms and abdominal pain. While he drove home that evening, his abdominal pain increased every time he hit a bump in the road. Overnight, the pain worsened. Axelrad felt so ill that he cancelled his Monday, August 18th psychiatric appointments and called Dr. Richard Jackson. Dr. Jackson suggested that Axelrad might have been suffering from gastroenteritis and recommended Pepto–Bismol.

By Tuesday morning, August 19th, Axelrad's pain was worse. He called Dr. Jackson again and scheduled an appointment. Axelrad's wife drove him to Dr. Jackson's office. She drove slowly because her husband's pain intensified with each bump in the road. Upon arrival at Dr. Jackson's office, she pushed her husband into the office by wheelchair and, with his help, answered Dr. Jackson's questions. Dr. Jackson examined Axelrad and ordered the following diagnostic tests: (1) ultrasound; (2) blood work; and (3) x-rays of kidneys, ureter, and bladder. He did not take Axelrad's temperature or perform a rectal examination. The Axelrads returned to their home after the tests. Around 4:30 p.m., Dr. Jackson called the Axelrads and informed them that the test results were normal. Dr. Jackson instructed Axelrad to take a laxative and perform two enemas. At that point, Dr. Jackson had not received all the results of Axelrad's blood tests. Subsequently, those tests revealed an elevated white blood cell count, indicative of an infection.

Axelrad took the laxative and attempted to perform the first enema. Immediately

after administering the enema, he was nauseous and in severe pain. The enema was not productive, and Axelrad fell to the floor vomiting. He experienced rigors and chills. Frightened, Axelrad's wife first called Dr. Jackson, who urged them to administer the second enema. She chose not to follow Dr. Jackson's recommendation. Instead, she immediately transported her husband to the emergency room.

In the hospital, tests revealed that Axelrad's white blood cell count had increased. Surgery on Thursday, August 21st, revealed diverticulitis and pus, which had escaped into the abdomen through a perforation of his colon. Axelrad had an eleven centimeter portion of his colon removed, a temporary colostomy, underwent three surgeries, and suffered a subsequent drug reaction and infection necessitating intensive care.

Axelrad sued Dr. Jackson for malpractice, contending Dr. Jackson failed to diagnose the diverticulitis and negligently prescribed enemas. The jury assessed fault as follows: 51% Axelrad—49% Dr. Jackson. The trial court entered judgment in favor of Dr. Jackson because apportionment of 51% fault to Axelrad bars recovery under the comparative negligence statute.

## II. Patient's Negligence

In his first six issues, Axelrad questions whether a patient may be assessed comparative negligence in providing a medical history. Accordingly, Axelrad contends a patient's duties are limited to certain circumstances not present in this case.[1] Axelrad further questions whether there is evidence that he breached a duty, and whether there is evidence of causation sufficient to support the jury's apportionment of fault.

Texas law allows a jury to consider a patient's comparative fault in a medical malpractice suit. See Elbaor v. Smith, 845 S.W.2d 240, 245, 251 (Tex.1993) (holding it was error to omit patient's name in comparative fault question where patient's refusal to take antibiotics contributed to infection, which was basis of her medical malpractice claim); see, e.g., Marvelli v. Alston, 100 S.W.3d 460, 468 (Tex.App.-Fort Worth 2003, pet. denied) (patient was 29% at fault); Sloan v. Molandes, 32 S.W.3d 745, 752 (Tex.App.-Beaumont 2000, no pet.) (patient was 49% at fault); Isern v. Watson, 942 S.W.2d 186, 200 (Tex.App.-Beaumont 1997, writ denied) (patient was 35% at fault). A patient has the duty to cooperate with a treating physician. Elbaor, 845 S.W.2d at 245.[2]

1. The dissent contends the majority opinion creates a "new legal standard for analyzing contributory negligence." On the contrary, this case involves assessment of negligence and our legal sufficiency review requires us to determine whether there is evidence sufficient to establish all of the four elements of an ordinary negligence claim against Axelrad, one of which is "duty." See Edward D. Jones & Co. v. Fletcher, 975 S.W.2d 539, 542–43 (Tex.1998). The existence of a legal duty is a threshold question of law based on the specific facts of a case. Kukis v. Newman, 123 S.W.3d 636, 639 (Tex.App.-Houston [14th Dist.] 2003, no pet.); see Thapar v. Zezulka, 994 S.W.2d 635, 637 (Tex.1999). A party cannot be found negligent where no duty ex-

ists. See Thapar, 994 S.W.2d at 637. This case does not involve a "new standard of care" because we are dealing with the duty of ordinary care assignable to a layman and gauged by conduct society expects from a reasonably prudent person. Accordingly, in this case of first impression, we will outline the patient's duty to cooperate when the physician requests the patient's medical history.

2. In Elbaor, the physician contended the patient was negligent for failing to follow orders and take medication. Ordinarily, the patient's duty to follow the physician's order and take medication would be triggered if the physician simply prescribed medication. Absent evidence of miscommunication by the

No Texas appellate court has directly addressed whether a plaintiff's failure to accurately or completely relate his or her medical history to the treating physician may constitute contributory negligence. *But cf. Isern,* 942 S.W.2d at 200 n. 7 (noting issue, although jury did not find patient negligent). However, we have reviewed authority from other states in order to analyze the issues in this case.

■ A patient has no duty to diagnose his or her own condition. *Fall v. White,* 449 N.E.2d 628, 634 (Ind.Ct.App.1983); *Mackey v. Greenview Hosp., Inc.,* 587 S.W.2d 249, 255 (Ky.Ct.App.1979); *O'Neil v. State of New York,* 66 Misc.2d 936, 323 N.Y.S.2d 56, 61 (N.Y.Ct.Cl.1971); *Lambert v. Shearer,* 84 Ohio App.3d 266, 616 N.E.2d 965, 977 (1992); *see Robinson v. Wa. Internal Med. Assocs., P.C.,* 647 A.2d 1140, 1156 (D.C.1994) (Mack, J., dissenting); *Carreker v. Harper,* 196 Ga.App. 658, 396 S.E.2d 587, 589 (1990) (Pope, J., dissenting).[3]

■ A patient, generally lacking the specialized training of the doctor from whom he seeks help, has limited capacity to select and communicate pertinent and relevant aspects of his medical history. *Mackey,* 587 S.W.2d at 255; *Favalora v. Aetna Cas. & Sur. Co.,* 144 So.2d 544, 550 (La.Ct.App.1962). A patient may rely upon the doctor to ask appropriate questions about the patient's history. *Hawkins v. Greenberg,* 159 Ga.App. 302, 283 S.E.2d 301, 307 (1981); *Fall,* 449 N.E.2d at 634; *Mackey,* 587 S.W.2d at 255; *Favalora,* 144 So.2d at 550; *see Robinson,* 647 A.2d at 1150 (Farrell, J., concurring), 1156 (Mack, J., dissenting); *O'Neil,* 323 N.Y.S.2d at 61 (it is incumbent upon trained physician to isolate the nature of the patient's complaints); *cf. Pratt v. Stein,* 298 Pa.Super. 92, 444 A.2d 674, 694 (1982) (in claim that patient failed to fully disclose prior treatments for back, it was questionable whether patient "was even asked if he had previously received treatment for his back"). A patient then has the duty to respond accurately and to tell the truth. *Rochester v. Katalan,* 320 A.2d 704, 709 (Del.1974) (patient was untruthful about his symptoms in order to receive methadone); *Mackey,* 587 S.W.2d at 254; *Jensen v. Archbishop Bergan Mercy Hosp.,* 236 Neb. 1, 459 N.W.2d 178, 184 (1990); *Brown v. Dibbell,* 227 Wis.2d 28, 595 N.W.2d 358, 368–69 (1999); *see Skar v. Lincoln,* 599 F.2d 253, 260 (8th Cir.1979) (applying Nebraska law where patient

physician or misunderstanding attributable to the patient, there is no obvious contingency or condition precedent relative to the patient's duty to follow the doctor's orders or take prescribed medication. Accordingly, the patient's duty is fully outlined under the standard definition of ordinary care. However, in a misdiagnosis case where the physician claims the patient was negligent for failing to disclose specific events or physical conditions in his medical history, it is necessary for the court to identify the circumstances under which a patient might breach the duty of ordinary care. For example, if the physician fails to ask a particular question regarding origin or chronology of symptoms, should the patient be assessed negligence if he does not volunteer the information? What if the patient fails to report specific events in his medical history because he does not understand the diagnostic significance of the information? Obviously the patient's duty under an ordinary negligence standard is more difficult to define. However, no "new standard of care" is created when the court defines circumstances under which a patient breaches the duty to cooperate in a misdiagnosis case.

3. Dr. Jackson cites *Carreker* for the proposition that a patient has a general duty to fully disclose his or her symptoms. In the plurality opinion, the court fails to detail the questions asked of the patient who was misdiagnosed with gastroenteritis instead of appendicitis. Further, in this nine-judge opinion by the Georgia court, four dissented and four concurred.

gave materially false information); *Johnston v. Ward,* 288 S.C. 603, 344 S.E.2d 166, 173 (Ct.App.1986) (woman who overdosed on prescription drugs and aspirin denied taking anything but prescription medication); *see, e.g., Moodie v. Santoni,* 292 Md. 582, 441 A.2d 323, 327 (1982) (each month, patient indicated no symptoms in response to specific inquiry, although he was experiencing adverse reactions to medication that ultimately led to his death); *Davila v. Bodelson,* 103 N.M. 243, 704 P.2d 1119, 1124 (Ct.App.1985) (testimony that patient failed to reveal prior pregnancies when asked).

■ A patient has no general duty to volunteer information. *Mackey,* 587 S.W.2d at 255; *see Favalora,* 144 So.2d at 550. However, courts have sometimes held a patient must volunteer information "if the patient is aware that the treating physician has failed to ascertain some aspect of the patient's medical history which the patient knows involves a risk of harm

to the patient during the course of future medical treatment." *Mackey,* 587 S.W.2d at 255; *see Haynes v. Hoffman,* 164 Ga. App. 236, 296 S.E.2d 216, 217–18 (1982); *Graham v. Keuchel,* 847 P.2d 342, 358 n. 78 (Okla.1993) (patient knew importance of her blood type and need for Rho–GAM shot during pregnancy, but failed to reveal it to her doctor); *see, e.g., Jamas v. Krpan,* 116 Ariz. 216, 568 P.2d 1114, 1115–16 (Ct.App.1977) (patient who knew significance of her history of breast lumps failed to reveal such history to physician performing breast examination).

■ Following our survey of authority from other states, we hold that a patient's duty to cooperate includes responding truthfully to a physician's questions.[4] A patient has no general duty to self-diagnose or volunteer information. A duty to volunteer information arises only when a patient knows the significance of unrevealed history and knows the physician has

4. The dissent misinterprets our holding with the following assertion: "Requiring physicians to ask specific questions in excess of those required by the applicable standard of care would impose unnecessary burdens on the doctor-patient relationship and add inefficiencies to the healthcare system." Respectfully, our colleague has focused her concern on an issue which is not presented by the litigants or addressed in this opinion. Apparently, our colleague refuses to acknowledge that assessment of negligence against a *physician* is based on standards of care which are the subject of expert testimony. In a medical malpractice case, the *physician's* liability is measured by standards of care in the profession whether the *patient* is comatose or capable of reporting, in explicit detail, all of his medical history. *This* case involves assessment of negligence against the *patient* under the "person of ordinary prudence" standard. We reject our colleague's contention that the majority has created a "new legal standard of care." By suggesting that a "new standard" will impose new duties on doctors to ask precise questions of their patients, the dissent fails to understand that our legal sufficiency review involves a search of the appellate record for evidence to support *Dr. Jackson's specific* allegations of negligence against Axelrad. In determining whether the evidence is legally sufficient to support assessment of any negligence against Axelrad, we are properly searching the record for evidence supporting Dr. Jackson's contention that his *patient* breached a duty to report abdominal pain originating in the left lower quadrant and to report a 1994 visit to another physician. As in all negligence cases, we must determine if there is any evidence establishing *duty,* the first element of a negligence cause of action. In this case, the patient's duty to truthfully report history and symptoms is triggered when the physician asks a question reasonably calculated to elicit the information needed for an accurate diagnosis. Our determination of whether there is any evidence that a duty was breached is based on the well-known legal sufficiency standard of review; not, as the dissent suggests, create an "unwieldy and imprudent legal standard for determining the legal sufficiency of the evidence of contributory negligence in professional malpractice cases."

failed to ascertain the history.[5]

We will determine whether there is legally sufficient evidence to support Dr. Jackson's contention that Axelrad breached the duty to exercise ordinary care in responding or failing to respond to inquiries regarding his medical history. Dr. Jackson claims Axelrad was negligent in failing to reveal (1) that his abdominal pain originated in the left lower quadrant of his abdomen, and (2) a 1994 medical examination in which a proctoscopy was conducted because of rectal bleeding and during which a colonoscopy was recommended to be performed within two years.

### A. Standard of Review

When a party challenges legal sufficiency of the evidence supporting an adverse finding relative to an issue on which he does not have the burden of proof, he must demonstrate on appeal that there is no evidence to support the adverse finding. *Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 347 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983)). We consider all the evidence in the light most favorable to the jury's verdict, indulging every reasonable inference in favor of the prevailing party. *Id.* (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998)). Only the evidence and inferences supporting the finding are considered and we must disregard all evidence and inferences contrary to the jury's finding. *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). However, this rule may not be expanded to sustain a jury verdict supported only by meager circumstantial evidence from which the jury might "infer" a fact contradicted by direct evidence.

### B. Origination of Pain

Dr. Jackson admitted that a patient's history is a very important tool for rendering a correct diagnosis. Regarding Axelrad's abdominal pain, Dr. Jackson argues that its genesis is a crucial aspect of this case. He contends Axelrad's failure to advise him that the pain originated in the left lower quadrant is contributory negligence. Thus, we examine the record for evidence that Axelrad untruthfully reported his symptoms in response to Dr. Jackson's questions.

We find no evidence in the record that Dr. Jackson asked a question calculated to elicit the origin of Axelrad's pain. Instead, only a few questions by Dr. Jackson are delineated in the appellate record. For instance, when he spoke to Axelrad via telephone on Monday, August 18th, Dr. Jackson testified that he asked, "Well, tell me exactly what is going on?" After Axelrad explained that his abdomen was uncomfortable, Dr. Jackson asked him where his discomfort was, and Axelrad responded that his entire abdomen hurt. Although Dr. Jackson testified, "I asked him some questions about his discomfort and what was happening," the record does not reflect that he posed a question about the location of Axelrad's initial pain. Instead, our review of the record indicates that Dr. Jackson relied on information volunteered by Axelrad: "I never heard any information about pain in the left lower quadrant and I never realized that he had that, if he did."

On Tuesday, August 19th, Dr. Jackson first communicated with Axelrad by tele-

---

**5.** Disregarding chronology, the dissent labors long and hard with references to Axelrad's deposition and trial testimony in an effort to demonstrate that the record supports the following inference: *on the occasion in question,* Axelrad understood the significance and had a duty to report that his abdominal pain *originated* in the left lower quadrant.

phone. Again, there is no evidence he asked where Axelrad's pain originated. Rather, Dr. Jackson testified that Axelrad described his current pain "on both sides of his abdomen." Dr. Jackson also testified that during the office visit on Tuesday, it was Mrs. Axelrad who gave the patient history, punctuated with comments from her husband, who was sitting in a wheel chair. Dr. Jackson again testified that neither Axelrad nor his wife ever volunteered that the pain began in the left lower quadrant. Jackson's written notes from that office visit indicate only, "complains of abdominal pains for two days, appetite diminished, complains of vague bilateral abdominal discomfort and supra-pubic discomfort; no nausea, no abdominal pain except with certain movements; loose stools for one to two a day." Further, during the office visit, there was no questionnaire submitted to the Axelrads about the current complaint or about Axelrad's medical history.[6] Cf. Moodie, 441 A.2d at 327 (patient failed to report symptoms on monthly questionnaires about his reactions to a certain medication).

Finally, Dr. Jackson spoke with the Axelrads twice on Tuesday, August 19th, after the office visit. In neither instance did he ask about the specific location and genesis of Axelrad's pain.[7] Given the questions posed to him, there is no evidence that Axelrad inaccurately or untruthfully described his symptoms. See O'Neil, 323 N.Y.S.2d at 61 (patient was not negligent in reporting her use of barbiturate, but not her addiction to it, where physician made no inquiry into dosage or duration of use); see also Allman, 667 P.2d at 301.

The question remains whether Axelrad had a duty to volunteer that his pain began in the left lower quadrant when Dr. Jackson did not ask a question designed to elicit that information. In Haynes v. Hoffman, the trial court instructed the jury: "If a patient is aware that the physician is unaware of some aspect of the patient's medical history which may involve a risk of harm to the patient, then ordinary care requires that the patient volunteer this additional information to the treating physician." 296 S.E.2d at 217. "A patient is contributorily negligent only if he knows the physician is unaware of a condition which imposes a risk of danger to the patient and his failure to inform the physician is unreasonable under the circumstances." Mackey, 587 S.W.2d at 255. Implicit in these cases is the patient's awareness of the significance of the unreported history. See Graham, 847 P.2d at 358 & n. 78 (patient knew the importance of her blood type and receiving Rho–GAM shot during pregnancy, but failed to advise doctors during her fifth

6. In contrast, at Healthsouth, where Axelrad underwent an ultrasound on Tuesday, a patient questionnaire was completed. In the Healthsouth questionnaire, Axelrad responded to a question regarding his initial symptoms. He wrote that his symptoms began with "onset of malasia [sic] followed by pain." "Malaise" means a feeling of bodily discomfort.

7. The dissent effectively concedes there is no evidence in the appellate record that Dr. Jackson asked appellant about origin of pain in the left lower quadrant of his abdomen. However, our colleague believes Dr. Jackson's testimony that he routinely asks patients about any other problems they may have experienced since their last visit provides some evidence that Axelrad was "afforded" the "opportunity to respond, disclosing both his pain and his history." Our colleague seems most willing to allow an open-ended question by the physician to serve as a trigger establishing the patient's duty to provide relevant and learned responses that fit a diagnostic protocol obviously known only to a qualified expert. Based on our survey of authority from sister jurisdictions and proper application of the standard of review for legal sufficiency, we respectfully disagree.

pregnancy). In this case, we note Axelrad's *trial* testimony that he revealed to Dr. Jackson left lower quadrant pain, which became diffuse. However, Axelrad did not testify that he understood the significance of abdominal pain originating in the left lower quadrant when he was questioned by Dr. Jackson. Dr. Jackson contends Axelrad was negligent in failing to state specifically that his abdominal pain began in the left lower quadrant. It is Dr. Jackson's allegation of negligence that guides us to search the record for a specific question calculated to elicit a specific answer. Notwithstanding our dissenting colleague's numerous suggestions of what the jury may "infer," there is no evidence in this record supporting the contention that Axelrad knew about the importance of pain originating in the left lower quadrant of his abdomen when he sought treatment from Dr. Jackson.

We see no reason to disagree with the majority of jurisdictions that previously addressed this issue. Accordingly, Axelrad's name should not have been submitted in comparative fault questions based on a failure to advise Dr. Jackson that his pain originated in the left lower quadrant of his abdomen.

### C. 1994 Medical Examination

■ The remaining alleged act of comparative negligence is Axelrad's failure to report a 1994 medical examination in which a proctoscopy was performed and a colonoscopy was recommended to be performed within two years. Again, there is no evidence Dr. Jackson asked a question calculated to elicit this information.[8] There is similarly no evidence that Axelrad understood the significance, if any, of this information when he presented to Dr. Jackson with abdominal pain in 1999.[9]

■ One of the elements of a cause of action for negligence is proximate cause. Accordingly, there must be some evidence or proof of a causal connection between the alleged contributory negligence and the subject injury. *Allman v. Holleman*, 233 Kan. 781, 667 P.2d 296, 300–01 (1983) (no connection between patient's death and taking birth control pills); *LaCombe v. Dr. Walter Olin Moss Reg'l Hosp.*, 617 So.2d 612, 615 (La.Ct.App.1993) (no connection between lower back problems, which patient failed to reveal, and sciatica suffered during bladder surgery); *Lambert*, 616 N.E.2d at 977. "[T]he contributory negligence of the patient must have been an active and efficient contributing cause of the injury made the basis of the patient's claim...." *Sendejar v. Alice Physicians & Surgeons Hosp., Inc.*, 555 S.W.2d 879, 885 (Tex.Civ.App.-Tyler 1977, writ ref'd n.r.e.). Dr. Jackson testified that if he had known Axelrad suffered from an "inflam-

8. The dissent does not refer to any evidence in the record that Dr. Jackson timely asked a question reasonably calculated to elicit information pertaining to Axelrad's 1994 proctoscopy where the problem was identified as hemorrhoids.

9. The dissent believes there is evidence sufficient to support a reasonable inference that Axelrad understood the importance of certain symptoms but failed to volunteer that information. Our colleague concludes: "Dr. Axelrad did not disclose his history of bowel problems to Dr. Jackson during his initial presentation." Notably, in her search for evi-

dence to support this inference, our colleague disregards Dr. Jackson's trial testimony regarding Mrs. Axelrad's statements during the August 19, 1997 office exam. Dr. Jackson testified as follows: "Mrs. Axelrad, in talking to me, said Dr. Axelrad has spent long times in the bathroom, like 30 and 45 minutes at a time. And he—she characterized it as weird bowel habits. I asked a little bit further, and it sounds like he was having a lot of action even before this time I had seen him, more than she thought was normal, and that's why I assume she characterized it as weird."

matory condition," he "would have taken a different tact." Viewed in context, this quoted testimony does not refer to the recommended colonoscopy or the 1994 proctoscopy, which apparently revealed no abnormalities. Further, while experts testified that such information would have been helpful in forming a differential diagnosis, there is no evidence that knowledge of the three-year-old proctoscopy or recommended colonoscopy would have changed Dr. Jackson's treatment of Axelrad. *See Pratt*, 444 A.2d at 686–87. Accordingly, there is no evidence of causation.

### D. Lax Care of Health

■ In his brief, Dr. Jackson mentions that Axelrad's lax care of his health over the years was contributory negligence: "Instead of treating a compliant patient who took responsibility for his own health, [Dr. Jackson] was faced with a male patient over fifty years old who had not scheduled a yearly physical exam in six years." At trial, Dr. Jackson extensively argued this theory to the jury:

Workaholics, especially in the case of Dr. Axelrad, is [sic] one who didn't take care of himself and didn't seek out his own healthcare as he appropriately should have done.

What we know is there is no time when he got himself into the doctor's office for a full physical examination between 1991 and 1997. He's a man in his fifties. As the medical testimony has told you, those are people who need to have yearly physical examinations and workups, but he didn't do that.... That's not what a reasonable and prudent person should do and he bears responsibility for the culmination of what that caused.

What did it cause in this case? ... [I]t caused him to begin the process of

diverticulitis, which did not get diagnosed until he needed an operation. That's what it caused. In the question we are asked: Was Dr. Axelrad negligent? The answer to that question is yes. Why? Because he didn't seek out the appropriate medical care in order to avoid the operation.

. . . .

Getting in there early takes responsibility by the patient. The patient has a duty to seek out medical care and to do that on a routine basis in order to avoid problems that we have in this particular case....

I believe very strongly ... that the answer to Question No. 2, that the responsibility should rest solely on Dr. Axelrad. I believe the primary person who could have avoided all of this would have been Dr. Axelrad.

... I believe that no amount should be awarded in this case because I don't think that if we don't take responsibility for our own health care that we should blame others.

■ Although a patient's contributory "negligence can serve to diminish recovery under modern comparative negligence principles, it is patently clear that such negligence must be contemporaneous with the malpractice of the physician." *Lambert*, 616 N.E.2d at 976. In other words, the contributory negligence "must have been simultaneous and co-operating with the alleged fault of the defendant, must have entered into the creation of the cause of action[,] and must have been an element in the transaction which constituted it." *Sendejar*, 555 S.W.2d at 885 (error to submit contributory negligence question to jury in medical malpractice suit where plaintiff's car wreck necessitated treatment by defendants). "[I]f the patient's negligent act merely precedes that of the physician and provides the occasion for

medical treatment, contributory negligence is not a permissible defense." *Weeda,* 521 A.2d at 1167. "Hence, it is improper to suggest, as defendant did at trial, that negligent conduct of the patient prior to coming under the care of the defendant physician could serve to constitute negligence." *Lambert,* 616 N.E.2d at 976. "Sick people deserve the same care whether they smoke, drink, drive too fast, or engage in socially unacceptable behavior." *Id.* Again, we see no reason to depart from standards outlined by sister jurisdictions. Accordingly, Axelrad may not be considered comparatively negligent for being inattentive to his health before seeking Dr. Jackson's professional opinion and medical care.

### E.   No Reasonable Inference

The dissent concludes Axelrad negligently failed to reveal relevant medical history. First, based on a conflict between Axelrad's deposition and trial testimony, the dissent suggests that Axelrad had a duty to volunteer information regarding the specific origin of his abdominal pain. Axelrad failed to mention that he informed Dr. Jackson about the origin of pain in the left lower quadrant of his abdomen during his pre-trial deposition. However, Axelrad gave the following contradictory trial testimony: "I told [Jackson] that it started off with left lower quadrant pain initially Sunday night, then became diffuse...." The dissent concludes this testimony provides the basis for the jury to infer that Axelrad understood the diagnostic significance of

abdominal pain originating in the left lower quadrant when he called Dr. Jackson.[10]

Although circumstantial evidence may be used to establish any material fact, it must transcend mere suspicion. *Lozano v. Lozano,* 52 S.W.3d 141, 149 (Tex.2001) (Phillips, C.J., concurring & dissenting). An inference is a deduction from proven facts. *Id.* (citing *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059, 1064 (1898)). Any inference drawn from circumstantial evidence must be fair and reasonable. *See Blount v. Bordens, Inc.,* 910 S.W.2d 931, 933 (Tex.1995). Otherwise, the inference is merely a guess and is, in legal effect, no evidence. *Lozano,* 52 S.W.3d at 148.[11] Here, Axelrad's testimony that he reported left lower quadrant pain tells us nothing, one way or another, about whether he recognized its significance. Any inference from this testimony is simply a guess.

Further, there are at least three items of direct evidence which render unreasonable and implausible the dissent's suggestion that circumstantial evidence will support the inference Axelrad understood the diagnostic significance of left lower quadrant pain and the *1994 recommendation* of a colonoscopy, but failed to timely provide the information to Dr. Jackson: (1) the mere fact that Axelrad was in excruciating pain when he contacted Dr. Jackson and sought treatment; (2) testimony—from both Axelrad and Dr. Jackson—that Axelrad's erroneous self-diagnosis at the time he called Dr. Jackson was a condition called "rebound," *cf. Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 710 (Tex.

10.   According to the dissent, the jury could disbelieve Axelrad's trial testimony that he informed Dr. Jackson about the left lower quadrant pain, but paradoxically infer from his incredulous assertion the unsupportable conclusion that he understood the diagnostic significance of left lower quadrant pain, when he first contacted Dr. Jackson. Such inference is patently unreasonable.

11.   Application of the equal inference rule in *Lozano* involved conduct and contradictory testimony of several witnesses. This case involves the impeached or contradictory testimony of one witness.

2003) (inference about plaintiff's lack of knowledge was unreasonable in light of undisputed evidence); and (3) Axelrad's answer to the following questions during direct and cross examination:

Q. Now, since that night, since you—*after you go to the hospital,* then what happens? *What do you learn?*

A. Well, Mr. Chandler, I learned that I had been suffering from diverticulitis for a significant period of time

\* \* \* \* \*

Q. (By Mr. Sprott) And, in fact, Doctor, I asked you on that Monday what you were feeling and you said diffuse abdomen pain, correct?

A. Correct.

Q. I asked you if it was in the upper and lower quadrants. And you answered what?

A. I don't have the—

Q. You answered yes?

A. Yes.

Q. I asked you if it was on the left and the right and you answered yes, didn't you?

A. Yes.

Q. *Now, you know—at least I hope by now*—that that's not a classical finding for diverticulitis, is it?

A. No.

Q. A classic finding for diverticulitis based upon your knowledge is you are going to have left lower quadrant pain, correct?

A. Correct.

This direct evidence flies in the face of the dissent's conclusion that there is some circumstantial evidence from which the jury may *reasonably* infer Axelrad understood the significance of unreported history when he was in excruciating pain. Accordingly, the dissent's suggestion that we must defer to the jury finding under the equal inference rule is misplaced. *Lozano,* 52 S.W.3d at 147. In the instant case, there is no equal inference when direct evidence trumps and supervenes the purported inference from circumstantial evidence. Any such inference is patently unreasonable.

In cases of only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or non-existence. *Id.* We must consider the totality of the known circumstances in determining legal sufficiency of the circumstantial evidence and the *reasonable* inferences to be drawn therefrom. *See Felker v. Petrolon, Inc.,* 929 S.W.2d 460, 464 (Tex.App.-Houston [1st Dist.] 1996, writ denied).

Moreover, hospital records indicate that Axelrad complained: "I have a belly ache." Nothing in Axelrad's words or actions supports an inference that he knew the significance of left lower quadrant pain. Inferences that are not reasonable and logical cannot support a jury's finding. *See Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997).

Clearly, the dissent believes Axelrad is untruthful. Our colleague gleans "inferences" for the jury from inconsistencies in medical records, deposition and trial testimony. However, inferences must be deduced from the evidence. *Lozano,* 52 S.W.3d at 149. Discrepancy between pretrial and trial testimony is not, in and of itself, evidence. Instead, the discrepancy goes to Axelrad's credibility, which solely the jury assesses. *Gorges Foodserv., Inc. v. Huerta,* 964 S.W.2d 656, 670 n. 9 (Tex. App.-Corpus Christi 1997, no pet.) (discrepancy between interrogatory answer and trial testimony); *see Kratz v. Exxon Corp.,* 890 S.W.2d 899, 903 (Tex.App.-El Paso 1994, no writ) (conflicts between statements); *Gray v. Floyd,* 783 S.W.2d

214, 217 (Tex.App.-Houston [1st Dist.] 1990, no writ) (discrepancy between deposition and trial testimony). At most, the discrepancy reflects that Axelrad learned the importance of left lower quadrant pain by the time of trial and adjusted his testimony accordingly.

Next, the dissent imputes knowledge to Axelrad from other physicians' testimony that left lower quadrant pain is a classical symptom of diverticulitis. From these physicians' testimony, the dissent infers that (1) medical doctors know the classic presentation of diverticulitis, and (2) because Axelrad, as a psychiatrist, has a medical degree, he too knew the significance of left lower quadrant pain. This is an impermissible stacking of inferences and is not legally sufficient evidence. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex.2003) (also noting that "some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.")

The dissent refers to a three-year-old proctoscopy for rectal bleeding (that is, hemorrhoids) in which no abnormalities were found. At that time, the physician recommended that a colonoscopy be performed within two years. From this, the dissent suggests the jury could reasonably infer that Axelrad was aware of "problematic bowel history" which he should have reported without any prompting. Additionally, the dissent suggests the record reflects that Dr. Jackson could have accurately diagnosed Axelrad's condition if he had been "aware" of "additional medical history" that was documented after Axelrad was admitted to the hospital. Notably, Dr. Jackson ordered a CT-scan after becoming "aware" of this purported "addi-

tional history." However, the record reflects that *after* reviewing additional history and the CT-scan results, Dr. Jackson's impression was "*diagnosis probably not diverticulitis.*"

Lastly, the dissent's reliance on *Elbaor* is misplaced. She suggests that the court avoid attempts to identify and define the duty relative to Dr. Jackson's claim of comparative negligence against Axelrad. Respectfully, our dissenting colleague unnecessarily raises concerns about "unwieldy and imprudent legal standards" in professional malpractice cases. We have not altered the standard of care for physicians in Texas. We have confined our analysis to a determination of whether there is any evidence to support the duty element of an ordinary negligence claim against a patient. Consistent with the standard of review for legal sufficiency, we have searched the record for evidence supporting Dr. Jackson's claim that Axelrad breached a legal duty. Accordingly, it was necessary for us to define Axelrad's duty under the facts of this case.

Succinctly, our dissenting colleague believes the negligence finding against Axelrad is supported by an inference from circumstantial evidence. Consistent with our standard of review, have searched the record for any direct or circumstantial evidence which supports a negligence finding against Axelrad.[12] We find no evidence to support assessment of comparative negligence against Axelrad.

### III. PATHOLOGIST'S TESTIMONY

In issues seven through ten, Axelrad challenges the qualifications of Dr. Mary Schwartz, a pathologist, and the reliability of her testimony. A two-part test

12. We have considered all the evidence in a light most favorable to the jury's verdict. Our reference to specific items of evidence and testimony which do not favor the jury's verdict should be viewed as responses to the dissent's conclusion that the jury may infer certain facts from circumstantial evidence.

governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and based on a reliable foundation. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001). Axelrad contends Dr. Schwartz was not qualified to render an opinion that Axelrad suffered a single bowel perforation before seeking Dr. Jackson's help. Axelrad's contention is based on the assertion that Dr. Schwartz did not have sufficient knowledge regarding the etiology of diverticulitis. We disagree that Dr. Schwartz's testimony should have been excluded.

## A. Qualifications

"Whether a witness is qualified to offer expert testimony is a matter committed to the trial court's discretion." *United Blood Serv. v. Longoria*, 938 S.W.2d 29, 30 (Tex.1997). The trial court determines whether the expert has "knowledge, skill, experience, training, or education" that would "assist the trier of fact." *See* TEX.R. EVID. 702. It is a proponent's burden to establish an expert's qualifications. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex.1996). Further, a proponent must show that the expert possesses special knowledge on the very matter on which he or she proposes to give an opinion. *Id.* at 152–53. We gauge abuse of discretion by whether the trial court acted without reference to any guiding rules or principles. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

In this case, the record[13] reveals that Dr. Schwartz is a board certified pathologist at Baylor University, where she is a full professor and holds an endowed chair. Her sub-specialties include anatomic pathology and cytology, the study of cells taken in biopsy. She has written several articles about gastrointestinal cytology, and she is familiar with pathology of the gastrointestinal tract. She testified that it is within a pathologist's area of expertise to estimate the age of a perforation based on examination of cells taken from a colon. Specifically, Dr. Schwartz testified that a pathologist looks for "acute inflammatory cells" (pus), which appear within one to two days after an injury; macrophages, which appear after the third day of injury; new blood vessels, and chronic inflammatory cells and fibroblasts, which appear a week or two after injury. Further, the surgeon who operated on Axelrad testified that "pathologists know more about" dating such perforations. Finally, Dr. Schwartz discounted Axelrad's theory of a microperforation followed by a larger perforation based on the amount and location of chronic inflammatory cells and fibroblasts versus acute inflammatory cells.

Based on this evidence, we conclude that the trial court did not abuse its discretion in finding Dr. Schwartz qualified to testify about the age of Axelrad's perforation. Lack of specialized training about the disease process of diverticulitis is not fatal to Dr. Schwartz's qualifications to testify in this case.

## B. Reliability

Next, Axelrad challenges the reliability of Dr. Schwartz's opinion that pathological findings were the result of a single perforation occurring at least a week before surgery. According to Axelrad's expert, Dr. Steven Kanner, Axelrad likely suffered a microperforation before he sought Dr. Jackson's help. According to Dr. Kanner, the enema prescribed by

13. The record includes both pre-trial and trial evidence pertinent to Axelrad's motion to exclude.

Dr. Jackson then caused a macroperforation to occur for the first time or caused the microperforation to enlarge significantly, spilling pus into Axelrad's abdomen. However, based on pathology revealing the presence of chronic inflammatory cells and fibroblasts, Dr. Schwartz concluded that Axelrad suffered a perforation before he sought Dr. Jackson's help and before his enema.

Although the trial court serves as an evidentiary gatekeeper by screening out irrelevant and unreliable expert evidence, it has broad discretion to determine the admissibility of that evidence. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex.2002). Some of the factors a trial court should consider in determining reliability include: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique. *Robinson*, 923 S.W.2d at 557. In gauging reliability, the trial court evaluates the methods, analyses, and principles relied upon in reaching the opinion, ensuring "that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of the discipline." *Helena Chem. Co.*, 47 S.W.3d at 499 (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 725–26 (Tex.1998)).

Axelrad contends that Dr. Schwartz's methodology was fallacious because she assumed all pathological findings were related to a single perforation. After reviewing the evidence, we do not agree that Dr. Schwartz's methodology rendered her opinion unreliable. Dr. Schwartz observed acute inflammatory cells on specimen tissue taken from Axelrad's colon. She also saw new blood vessels, histiocytes, chronic inflammatory cells, and fibroblasts. Based on her observations, she estimated a perforation that was one to two-and-a-half weeks old. When questioned whether Axelrad may have suffered a microperforation, which partially healed, followed by a larger perforation in the same site after the enema, Dr. Schwartz discounted such a theory. For such an event, she would expect the acute inflammatory cells to be located differently and a lesser amount of granulation tissue, which is created by fibroblasts. Further, Dr. Schwartz explained it was unlikely that a larger perforation occurred near an earlier microperforation: "If there were a second perforation nearby, I would expect to find an area of neutrophils without the surrounding granulation tissue, which I do not see." In short, she saw no microscopic evidence of a more recent perforation.

Additionally, at trial, Dr. Schwartz testified that since her deposition, she reviewed six major texts (four on gastrointestinal pathology) and five articles (including the standards of the American Society for Colorectal Surgeons), but "micro-perforation" was not a term of common usage in those writings. She simply disagrees with Axelrad's expert, Dr. Kanner, who used the term microperforation in his conclusions.

We agree with Dr. Jackson's contention that Axelrad is actually appealing the truth of Dr. Schwartz's conclusions, not the reliability of her opinion. However, "[t]he trial court's role is not to determine the truth or falsity of the expert's opinion." *Robinson*, 923 S.W.2d at 558; *see Weingarten Realty Investors v. Harris County Appraisal Dist.*, 93 S.W.3d 280, 285 (Tex.

App.-Houston [14th Dist.] 2002, no pet.). In this case, Dr. Schwartz did not merely assume a single perforation, but explained her opinion by the pathology results she viewed in Axelrad's slides. She described the pathology that is expected to be found if a microperforation occurs and is followed by a larger perforation, either at the same site or within close proximity. Further, Axelrad extensively cross-examined Dr. Schwartz about her opinions and limitations of pathology. Such cross-examination remains the traditional and appropriate means to attack admissible, though perhaps shaky, evidence. *Gammill*, 972 S.W.2d at 727. The trial court did not abuse its discretion in admitting Dr. Schwartz's testimony as reliable.

We overrule issues seven through ten.

## IV. CONCLUSION

We have overruled issues seven through ten because the trial court did not abuse its discretion in finding Dr. Schwartz qualified and in admitting her expert testimony as reliable. Following our survey of authority from sister jurisdictions, we sustain appellant's first six issues, and hold as follows: (1) a patient may rely upon a physician to ask appropriate questions about medical history; (2) a patient's duty to cooperate involves responding truthfully to a physician's questions; (3) a patient has no general duty to self-diagnose or volunteer information; (4) the duty to volunteer information arises only when a patient understands the diagnostic significance of unrevealed history and recognizes the physician has failed to ascertain that history; and (5) in a misdiagnosis case, the patient may not be assessed comparative negligence for being inattentive to his health before seeking the physician's professional opinion and care.

Viewing all the evidence and any reasonable inference supporting the jury's verdict, we find as follows: (1) there is no evidence Dr. Jackson inquired about origination of Axelrad's abdominal pain in the left lower quadrant before Axelrad performed the enema; (2) there is no evidence Dr. Jackson asked a question reasonably calculated to timely elicit a report of the 1994 examination for hemorrhoids and recommendation that a colonoscopy be performed within two years; (3) there is no direct evidence and no reasonable inference from circumstantial evidence that Axelrad was aware of the diagnostic significance of left lower quadrant pain or his 1994 examination before he performed the enema; and, finally, (4) there is no evidence in the record that Axelrad untruthfully described his medical history before performing the enema.

Accordingly, we hold that the trial court erred by including Axelrad's name in the comparative fault jury questions. We reverse and remand for a new trial.

GUZMAN, J., dissenting.

EVA M. GUZMAN, Justice, dissenting.

In determining the legal sufficiency of a doctor's assertion of his patient's contributory negligence, the Texas Supreme Court has asked whether, ignoring all evidence to the contrary, some evidence indicated the patient may have been contributorily negligent. *See Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992) (stating that "[t]o determine whether legally sufficient evidence supported [a] contributory negligence submission, we must examine the record for evidence supporting [the] question and ignore all evidence to the contrary ... [i]f we find some evidence indicating that [the patient] may have been contributorily negligent, then we must conclude that the trial court [was required to submit the contributory negligence issue to the jury for its determination]"). The majority opinion unnecessarily creates a new legal standard

for analyzing contributory negligence issues in professional malpractice cases. Under the *Elbaor* standard, however, the trial court properly entered judgment in favor of Dr. Jackson based on the jury's contributory negligence findings. Because the majority errs in concluding otherwise, I respectfully dissent.

## A. The majority opinion creates a new legal standard.

The majority holds that trial courts should not submit questions regarding the contributory negligence of a patient asserting a misdiagnosis malpractice claim unless the evidence raises a fact issue as to one or more of the following:

(1) whether the doctor asked the patient "a specific question" "designed" or "calculated to elicit" the "exact" information in question, the patient failed to communicate this information to the doctor, and this failure to communicate was a proximate cause of the occurrence in question;

(2) whether the doctor asked "appropriate questions about the patient's history," the patient "inaccurately or untruthfully reported his symptoms in response to [the doctor's] questions," and this inaccurate or untruthful response was a proximate cause of the occurrence in question;

(3) whether the patient was "aware that the treating physician [had] failed to ascertain some aspect of the patient's medical history which the patient [knew involved] a risk of harm to the patient during the course of future medical treatment" and the patient failed to communicate that information to the doctor; or

(4) whether the patient knew the doctor was "unaware of a condition which imposes a risk of danger to the patient" and the patient's failure to inform the doctor of this condition was "unreasonable under the circumstances."

The majority's new legal standard is unduly complicated and difficult to apply. Furthermore, in many malpractice cases, this standard will impose new duties on doctors to ask very precise questions of their patients before the submission of a contributory negligence question. The majority opinion does base its legal standard on various cases from other jurisdictions; however, the new legal standard that the majority creates for Texas makes it unduly difficult to raise a fact issue as to the contributory negligence of patients. Requiring physicians to ask specific questions in excess of those required by the applicable standard of care would impose unnecessary burdens on the doctor-patient relationship and add inefficiencies to the healthcare system.

The applicable standard here is that used by the Texas Supreme Court in *Elbaor. See Elbaor*, 845 S.W.2d at 243. In reviewing the trial court's denial of appellants' motion to disregard jury findings, we review the record in the light most favorable to the verdict, considering only the evidence and inferences that support the verdict and rejecting the evidence and inferences contrary to the verdict. *See Shell Oil Prods. Co. v. Main St. Ventures, L.L.C.*, 90 S.W.3d 375, 387 (Tex.App.-Dallas 2002, pet. dism'd by agr.) (stating standard of review for motion to disregard jury findings is the same as that for motion for judgment notwithstanding the verdict); *Rush v. Barrios*, 56 S.W.3d 88, 94 (Tex. App.-Houston [14th Dist.] 2001, pet. denied) (stating standard of review for motion for judgment not withstanding the verdict); *see also Elbaor*, 845 S.W.2d at 243 (applying no-evidence standard of review when trial court refused doctor's proposed question to the jury on contributory negligence). Applying this familiar stan-

dard of review, this court should simply ask whether there was some evidence at trial indicating that the contributory negligence of Dr. Axelrad (the patient) was a proximate cause of the occurrence in question. *See Elbaor*, 845 S.W.2d at 243. While Dr. Axelrad's contributory negligence may be based on his duty to cooperate with Dr. Jackson, this does not require the articulation of the complex system of subsidiary legal rules promulgated by the majority. *See id.* at 243–45; *Carreker v. Harper*, 196 Ga.App. 658, 396 S.E.2d 587, 588 (1990) (stating, in a majority opinion,[1] that "[i]t was for the jury to determine whether the plaintiff exercised ordinary care for her own protection, and the record provides adequate facts which support the jury's finding of comparative negligence, which was the proximate cause of the damages complained of"); *Moodie v. Santoni*, 292 Md. 582, 441 A.2d 323, 327 (1982) (stating that, for a patient to be "free of contributory negligence, as a matter of law, there must be no evidence of acts or conduct from which a reasonable mind could find or infer negligence on [his] part"); *Jamas v. Krpan*, 116 Ariz. 216, 568 P.2d 1114, 1115 (Ct.App.1977) (stating, "[o]nly where no reasonable evidence of contributory negligence has been presented can the trial court refuse to instruct the jury on the defense of contributory negligence").

## B. The trial court properly entered judgment in favor of Dr. Jackson based on the jury's contributory negligence findings.

A review of the record shows that under the *Elbaor* standard specified above, the trial court properly entered judgment in favor of Dr. Jackson based on the jury's contributory negligence findings.[2]

### 1. Procedural Posture of this Case

I begin by briefly noting the context of this case and the procedural posture in which it comes to us. Dr. Axelrad filed suit against Dr. Jackson for medical malpractice, alleging Dr. Jackson misdiagnosed his diverticulitis and, consequently, negligently prescribed an enema. At trial, Dr. Jackson argued that Dr. Axelrad was negligent in failing to give a full and complete history of his medical condition, including the genesis of his pain and his history of bowel problems.[3] The question submitted to the jury, without objection, was: "Did the negligence, if any, of those named below proximately cause the occurrence in question?" Dr. Axelrad and Dr. Jackson were both listed following the question. The jury was also instructed

1. The majority erroneously states that the *Carreker* opinion is a plurality opinion. *See Carreker*, 396 S.E.2d at 589. While the majority is correct that four judges on the court concurred, the majority overlooks the fact that these judges concurred in the presiding judge's opinion, not just the judgment. *See id.* Therefore, this opinion is a five-judge majority, not a one-judge plurality. *See id.*

2. The majority correctly finds that, on this record, Dr. Axelrad's inattention to his own health care is not contributory negligence.

3. In its analysis, the majority focuses only on whether Dr. Axelrad revealed lower left quadrant pain and Dr. Earle's recommendation that Dr. Axelrad have a colonoscopy. However, Dr. Jackson's argument is properly stated above. Also, there was some evidence that Dr. Axelrad failed to provide other information to Dr. Jackson. For example, Dr. Axelrad testified that he failed to inform Dr. Jackson of the proctoscopy performed on him in 1994, when he saw Dr. Earle for rectal bleeding, as well as Dr. Earle's recommendation. In addition, Dr. Jackson testified that during his initial telephone call to Dr. Jackson, Dr. Axelrad did not communicate that he had severe abdominal pain or a low grade fever. During his August 19 office visit, Dr. Jackson's notes indicate that Dr. Axelrad did not complain of nausea or abdominal pain "except with certain movements,...."

that "negligence" when used with respect to Dr. Axelrad's conduct meant:

> failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

The charge also instructed the jury as to the meaning of "ordinary care"[4] and "proximate cause"[5] as it related to Dr. Axelrad's conduct. The jury found Dr. Jackson 49% negligent and Dr. Axelrad 51% negligent and thus, concluded that in failing to disclose his prior medical history and symptoms, Dr. Axelrad was contributorily negligent in the alleged misdiagnosis.

On appeal, Dr. Axelrad lists several issues for our consideration regarding a pa-

tient's legal duty to communicate his medical history to his treating physician.[6] In addressing these issues, the majority imposes new duties on doctors to ask very specific questions of their patients before a contributory negligence question can be submitted.[7] However, the issues *as presented by Dr. Axelrad* are not before us.

Though the *existence* of a legal duty is a threshold question in a negligence action, Texas jurisprudence already recognizes that a patient has a legal duty to cooperate with his treating physician. *See Elbaor*, 845 S.W.2d at 245. Indeed, Dr. Axelrad acknowledges the existence of a duty in his brief, stating his "duty was to truthfully and to the best of his ability answer [Dr. Jackson's] questions." Moreover, the extent of Dr. Axelrad's duty was set forth in the jury charge.[8] *Cf. Shah v. Moss*, 67

---

**4.** " 'Ordinary care,' when used with respect to the conduct of David Axelrad, means that degree of care that a person of ordinary prudence would use under the same or similar circumstances."

**5.** " 'Proximate cause,' when used with respect to the conduct of David Axelrad, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event."

**6.** Specifically, Dr. Axelrad questions: "Does a patient have a legal duty to (i) know which facts in his medical history are relevant to his diagnosis and treatment and (ii) volunteer all such facts to the physician when he presents for treatment, or is it the physician's duty to ascertain the relevant medical history by questioning the patient?" and "When a physician doesn't ask about a particular aspect of the patient's medical history, and the patient doesn't volunteer such information, and there is no evidence that the patient intentionally withheld information that he knew was rele-

vant to his diagnosis and treatment, is the patient's failure to volunteer such information comparative negligence that will reduce or bar his recovery in a medical malpractice?"

**7.** The majority contends that on review, we must determine "whether there is legally sufficient evidence ... that Axelrad breached the duty ... in responding or failing to respond to inquiries regarding his medical history." In framing the inquiry in this manner, the majority adopts too narrow an approach, resulting in new duties on doctors to ask very precise questions of their patients before the submission of a contributory negligence question. Further, although this statement suggests the majority conducts a legal sufficiency analysis, their review of the evidence is limited to whether Dr. Jackson asked a specific question calculated to elicit the information in question.

**8.** In this case, the jury was instructed—without objection—to evaluate Dr. Axelrad's conduct in accordance with the ordinary standard of care used in *Isern v. Watson*, 942 S.W.2d 186, 201 (Tex.App.-Beaumont 1997, writ denied). *See also Moodie v. Santoni*, 292 Md. 582, 441 A.2d 323, 327 (1982) (noting that contributory negligence is to be measured by the standard of care of an ordinarily

S.W.3d 836, 844 (Tex.2001) (noting that the standard of care defined the duty owed). Because there was no objection to the charge, there is no need to flesh out the parameters of the duty in this case as the majority has done.[9] Instead, the issue the court must decide is whether there was legally and factually sufficient evidence that Dr. Axelrad was contributorily negligent in this misdiagnosis case.[10] *Compare Lozano v. Lozano,* 52 S.W.3d 141, 145 (Tex.2001) (examining sufficiency of the evidence in light of the unobjected to jury charge), *with Edward D. Jones & Co. v. Fletcher,* 975 S.W.2d 539, 542–43 (Tex. 1998) (finding complaint, that there was no evidence of breach of duty, is a legal sufficiency challenge as to which error may be preserved by motion for judgment notwithstanding the verdict or to disregard jury findings), *and Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.,* 987 S.W.2d 50, 52 (Tex.1998) (acknowledging that a motion to disregard preserves a no-evidence point on appeal).

We must determine, under the circumstances of this case, whether there is sufficient evidence to support the jury's conclusion that Dr. Axelrad failed to cooperate with Dr. Jackson in diagnosing his illness as a person of ordinary prudence would have done under the same or similar circumstances.[11]

### 2. Sufficiency Analysis

In reviewing the trial court's denial of appellants' motion to disregard jury findings, this court applies a no-evidence standard of review. *See Shell Oil Prods. Co. v. Main St. Ventures, L.L.C.,* 90 S.W.3d 375, 387 (Tex.App.-Dallas 2002, pet. dism'd by agr.) (citing *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990)). Thus, our standard of review in this appeal is deferential to the jury's findings. If the record contains any evidence of probative force to support those findings, the legal insufficiency challenge must be overruled. *Price Pfister, Inc. v. Moore & Kimmey,*

---

prudent person under the same or similar circumstances). In *Moodie,* the court noted that "what an ordinarily prudent and careful person would do under a given set of circumstances is usually controlled by the instinctive urge of one to protect himself from harm." *Moodie,* 441 A.2d at 325.

9. Although there was no objection to the charge, Dr. Axelrad did preserve error regarding the *sufficiency* of the evidence supporting the jury's contributory negligence findings by asserting a motion to disregard the jury's findings. *See Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.,* 987 S.W.2d 50, 52 (Tex.1998).

10. Notably, although the majority correctly acknowledges it must conduct a legal sufficiency review—in which we only consider the evidence in support of the jury's verdict—the majority does otherwise. For example, in response to evidence relied on as support for the jury's verdict in this dissent, the majority cites to record evidence it claims reflects that after reviewing the CT scan results, "Dr. Jack-

son's impression was 'diagnosis probably not diverticulitis.'" Moreover, in its factual recitation, the majority describes Dr. Axelrad's reaction to the enema as follows: "Axelrad fell to the floor vomiting.... Frightened, Axelrad's wife first called Dr. Jackson, who urged them to administer the second enema. She chose not to follow Dr. Jackson's recommendation. Instead, she immediately transported her husband to the emergency room." Although this is an accurate recitation of Dr. Axelrad's testimony, his wife testified slightly differently, stating that after Dr. Axelrad administered the enema to himself he "all of a sudden, came out [of the bathroom], just barely walking out of the bathroom, was throwing up ... Well he got to the bed. Once he got to the bed, he started shaking...." Also, Dr. Jackson testified that he was the one who recommended that Dr. Axelrad go to the hospital at that point.

11. Prior to examining the evidence, we should properly frame our inquiry. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 762 (Tex.2003).

*Inc.*, 48 S.W.3d 341, 347 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

When reviewing a no-evidence issue, we consider all of the evidence in the record in the light most favorable to the jury's verdict and we apply every reasonable inference that could be made from the evidence in its favor; we disregard all evidence and inferences to the contrary. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). No evidence exists when the record discloses one of the following: (1) a complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Rush*, 56 S.W.3d at 94. If there is more than a scintilla of evidence to support the jury's findings, then the trial court correctly denied the motion to disregard the jury's findings. *See id.* More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Havner*, 953 S.W.2d at 711. A jury's finding may be upheld on circumstantial evidence as long as it may fairly and reasonably be inferred from the facts. *Lozano*, 52 S.W.3d at 145. Further, each piece of circumstantial evidence must be viewed in relation to all known circumstances and not in isolation. *Id.* at 149.

### 3. A Patient's Contributory Negligence Under Texas Law

As the majority correctly acknowledges, Texas courts allow a jury to consider a patient's contributory negligence in malpractice cases. The patient's contributory negligence must have been an "active and efficient contributing cause of the injury made the basis of the patient's claim." *Sendejar v. Alice Physicians & Surgeons Hosp., Inc.*, 555 S.W.2d 879, 885 (Tex.Civ. App.-Tyler 1977, writ ref'd n.r.e.). Further, it must be "simultaneous and co-operating with the alleged fault of the defendant, must have entered into the creation of the cause of action and must have been an element in the transaction which constituted it." *Id.* As noted, Texas law also recognizes that a patient has a legal duty to cooperate with the treating physicians who assume the duty to care for them. *Elbaor*, 845 S.W.2d at 245.

Generally, in assessing a patient's contributory negligence, a jury may evaluate the patient's conduct without medical or expert testimony. *Isern v. Watson*, 942 S.W.2d 186, 201 (Tex.App.-Beaumont 1997, pet. denied). The patient is held to the standard of ordinary care, that is, the care of a person of reasonable prudence under the same or similar circumstances. *Id.* In deciding a patient's contributory negligence, the trier of fact may consider "common experience of mankind," to determine the care and diligence an ordinary, prudent person would use to prevent injuries under the circumstances of the case. *Id.* Moreover, a jury is given wide latitude in allocating responsibility under the comparative responsibility statute. *See N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 126 (Tex.App.-Beaumont 2001, pet. denied).

In a misdiagnosis case, the plaintiff must prove both a mistake in professional judgment and that the mistake was negligent.[12] *Robinson v. Weaver*, 550 S.W.2d 18, 21 (Tex.1977). Therefore, Dr. Axelrad's contributory negligence must have occurred in connection with Dr. Jackson's exercise of

---

12. Of course, it was Dr. Jackson's burden to establish Dr. Axelrad's contributory negligence. *See Kroger v. Keng*, 23 S.W.3d 347, 351 (Tex.2000).

his professional judgment and the resulting treatment. *See Sendejar,* 555 S.W.2d at 885 (noting that any alleged contributory negligence in a medical malpractice case must be a contributing cause of the injury made the basis of the plaintiff's claims); *see also Kerby v. Abilene Christian College,* 503 S.W.2d 526, 528 (Tex.1973) (stating that contributory negligence requires a causal connection with the incident causing injury that but for the conduct the accident would not have happened). Consequently, on review, we must examine the record to see if there is any evidence that Dr. Axelrad breached his duty to cooperate with Dr. Jackson in diagnosing his diverticulitis, as a person of ordinary prudence would do in those circumstances, and whether the breach proximately caused Dr. Axelrad's injury.[13] If there is any evidence that Dr. Axelrad failed to act as a person of ordinary prudence under the circumstances, we should uphold the jury's verdict.

Having framed our inquiry, the record reveals sufficient evidence to support the jury's findings that the contributory negligence of Dr. Axelrad was a proximate cause of the occurrence in question.[14] There was legally sufficient evidence of the following at trial:

(1) Dr. Axelrad's pain originated in the left lower quadrant of his abdomen;[15]

(2) When Dr. Axelrad presented to Dr. Jackson, Dr. Jackson asked him where his discomfort was and questioned him about his discomfort and what was happening;

(3) Dr. Axelrad did not tell Dr. Jackson that his pain originated in the left lower quadrant of his abdomen, nor of his relevant medical history;

(4) A classic symptom of diverticulitis is pain in the lower left quadrant of the abdomen;[16]

(5) Had Dr. Jackson known of Dr. Axelrad's lower left quadrant pain and pertinent medical history, he would have treated Dr. Axelrad differently and would not have prescribed the enema.

From this evidence the jury could reasonably infer that pain in the lower left qua-

13. Contrarily, the majority concentrates its examination of the evidence on whether Dr. Jackson asked a specific question of Dr. Axelrad. However, this approach presupposes that a patient's duty to cooperate includes only the duty to respond to specific queries.

14. The majority contends my analysis involves both an impermissible stacking of inferences and unreasonable inferences. However, some of the evidence in this case is circumstantial and therefore, we examine that evidence in light of what may be reasonably inferred from it. The record evidence, as the majority agrees, speaks for itself. "If circumstantial evidence will support more than one reasonable inference, the jury must decide which is more reasonable, . . . ." *Lozano,* 52 S.W.3d at 148. Indeed, a fact finder often chooses between opposing reasonable inferences and the choice may be influenced by the fact finder's conclusions on credibility.

*Id.* at 149. A jury is entitled to consider the circumstantial evidence, weigh the witnesses' credibility, and make "reasonable inferences from the evidence it chooses to believe." *Id.*

15. In addition to Dr. Axelrad's trial testimony to this effect, appellants asserted this in the statement of facts in their opening brief on appeal, and Dr. Jackson did not contradict this fact in his brief. Therefore, this court should accept this statement as true. *See* TEX.R.APP. P. 38.1(f).

16. The majority stresses the lack of evidence that Dr. Axelrad knew of the *significance* of this pain. Although that knowledge may be relevant to Dr. Axelrad's duty as defined by the majority in its analysis, because lower left quadrant pain is a classic symptom of diverticulitis, under my analysis, it is evidence that had Dr. Jackson known of this pain, he could have made a more accurate diagnosis.

drant of the abdomen is significant to a correct and timely diagnosis of diverticulitis and Dr. Axelrad's failure to tell Dr. Jackson that his pain originated in this area was a proximate cause of the delay in diagnosing the diverticulitis.[17] Thus, there is legally sufficient evidence to support the trial court's submission of Dr. Axelrad's contributory negligence to the jury.[18]

#### 4. Evidence of Dr. Axelrad's Contributory Negligence

During the course of the jury trial, there was a significant amount of testimony regarding Dr. Axelrad's medical history, his symptoms during the several days he presented to Dr. Jackson, and his subsequent care after going to the emergency room.

From the beginning of trial, Dr. Axelrad's credibility was placed before the jury. The jury was made aware that Dr. Axelrad's version of the circumstances surrounding the alleged misdiagnosis differed from Dr. Jackson's version, as well as from Dr. Axelrad's own deposition testimony. Specifically, the jury was made aware of discrepancies in the evidence regarding the history of Dr. Axelrad's visits to and communications with Dr. Jackson prior to 1997. On direct examination, Dr. Axelrad

testified that from 1991 through 1997, he remembered seeing Dr. Jackson on at least one occasion, and perhaps on two occasions. On cross-examination, however, it was revealed that Dr. Axelrad stated in his deposition he saw only one doctor from 1991 through 1997, and indicated the visit involved a doctor connected to an insurance matter, a doctor other than Dr. Jackson.[19] Dr. Jackson testified that he had not seen Dr. Axelrad as a patient from 1991 through 1997.

The testimony regarding the information Dr. Axelrad communicated to Dr. Jackson concerning his health was also contradictory. On direct examination, in describing his symptoms to Dr. Jackson, Dr. Axelrad testified numerous times that he told Dr. Jackson of an acute onset of pain on Sunday evening beginning in his "left lower quadrant," which became diffuse early Monday morning. However, during cross-examination, the following exchange occurred regarding the events leading up to the alleged misdiagnosis:

Q. That's what you told—when you called Dr. Jackson the next day on the 18th, you told him you are having some flu-like problems, didn't you?

---

17. As noted, there was evidence of other symptoms and history which was not communicated to Dr. Jackson. See supra note 4. However, because the majority and the parties primarily focus their arguments on this symptom and medical history, my analysis does so as well.

18. Applying the standard of review for factual sufficiency also shows that the jury's contributory negligence findings are supported by factually sufficient evidence. See In re C.H., 89 S.W.3d 17, 25 (Tex.2002); Cain v. Bain, 709 S.W.2d 175, 176 (Tex.1986).

19. When asked if he saw Dr. Jackson during the period from 1991 through 1997, prior to the onset of his symptoms which are the subject of this lawsuit, Dr. Axelrad claimed he believed he had seen him once or twice, relying on a notation on a medical record of a

doctor assigned to examine him in relation to an insurance policy in 1996. The notation indicated that Dr. Axelrad had seen Dr. Jackson in 1993. On cross-examination, it was established that the notation resulted from a medical history provided by Dr. Axelrad. Further, an additional notation in the record, stating "blood stool negative," indicated the visit in 1993 was in relation to a problem with bloody stools. When asked if Dr. Axelrad had seen Dr. Jackson because of a bloody stool problem, Dr. Axelrad said no, that was in relation to another exam. Upon further questioning, it appeared Dr. Axelrad may have indicated to the insurance doctor that he saw Dr. Jackson in 1993, when he was actually referring to a 1994 visit with Dr. Edward Earle, a colorectal surgeon, whom he saw for rectal bleeding.

A. Yes. He and I discussed that on that day.

Q. Now, when you started off your testimony earlier today, you said that it began as left lower quadrant pain, then became diffuse. Do you remember telling us all that?

A. Correct, yes.

Q. And you said under sworn testimony earlier today that you told Dr. Jackson that on Monday morning, the 18th. Do you remember telling us that?

A. Yes.

Q. That is a different story, isn't it, Dr. Axelrad, than you told me under sworn testimony at the time of your deposition? Isn't that right?

* * * *

Q. Doctor, I asked you: What did you tell Dr. Jackson when you called him that Monday morning?

* * * *

A. That my problems had returned. I had abdominal pain. I had diarrhea, occasional episodes of diarrhea on Sunday, that I had—and I took my temperature that morning and it was 100.6. I told him I had a mild temperature and I was having abdominal pain.

Dr. Axelrad's deposition testimony suggested he informed Dr. Jackson he was experiencing cramping pain in his abdomen and other flu-like symptoms, and evidences he failed to advise Dr. Jackson that he was experiencing pain in his lower left quadrant.[20] At that point in the trial, after reviewing his contrary deposition testimony, Dr. Jackson's counsel asked Dr. Axel-

rad if diffuse abdominal pain was a symptom associated with diverticulitis, and Dr. Axelrad acknowledged that a classic symptom of diverticulitis is lower left quadrant pain.[21]

In addition to this testimony, there was further evidence that lower left quadrant pain is a telling symptom of diverticulitis. Dr. Dobbs described the classical presentation of diverticulitis as complaints of severe abdominal pain, primarily in the lower left quadrant, fever and a change in bowel habits. Indeed, Dr. Dobbs testified that the only way to make a diagnosis with any sense of confidence was if the patient presented with lower left quadrant pain, tenderness by physical touch, and fever. Dr. Axelrad's brother, a urologist, testified as follows: "If you were to come into my office with left lower quadrant pain and tenderness, all right, and someone said you had a urinary tract infection and I did my physical examination and you were tender, left lower quadrant, that's simple diverticulitis." Dr. Jackson also testified that the "classical signs and symptoms" of diverticulitis were pain in the lower left quadrant of the abdomen and difficulty with bowel movements. This is some evidence that lower left quadrant pain is significant to a correct diagnosis of diverticulitis and the jury could reasonably infer that had Dr. Axelrad communicated that symptom to Dr. Jackson, a prompt and correct diagnosis may have been made.

In addition to this evidence, Dr. Jackson testified as to proximate cause.[22] Dr. Jackson testified that Dr. Axelrad never mentioned he had been experiencing ab-

---

20. Dr. Reardon's and Dr. Dobbs's notes also failed to reflect that Dr. Axelrad had communicated any lower left quadrant pain.

21. Notably, Dr. Axelrad testified both as a patient and as a physician. He introduced himself as a physician, described his medical training—among other things, he had worked

as an emergency room physician for five years—and was even offered as an expert.

22. The majority acknowledges that the record evidence reflects some causal connection: "Dr. Jackson relied on the information volunteered by [Dr.] Axelrad."

dominal problems for some time nor that he was having pain in his lower left quadrant. Specifically, the following was elicited at trial:

Q. Could any of his large time in the hospital and the significant treatments that he underwent, could any of those have been reduced if there had been a punctual diagnosis—

\* \* \* \*

Q. —of diverticulitis?

A. (Dr. Jackson) We're speculating that's possible.

\* \* \* \*

A. It is possible that if I had had the information that I have now, we would have treated him differently.

\* \* \* \*

Q. You would not have ordered an enema?

A. That's true.

\* \* \* \*

A. It depends on the constellation of symptoms. He presented with the symptoms that looked like viral disease to me.... If he had presented with specific signs and symptoms of peritoneal irritation, diverticulitis, which include fever, lower abdominal left lower quadrant pain, constipation, I would have looked at this very differently.

Q. Well—

A. If I had known that he had diverticulitis or an inflammatory condition for a long time in the past, even before he presented to me, I certainly would have taken a different tact.

\* \* \* \*

A. Well, if I had received telephone calls from Dr. Axelrad about abdominal pain, he would have been in my office; and I would have examined him. He would have already had either a barium enema or a colonoscopy and would have known about his rather severe condition—

According to Dr. Jackson's testimony, Dr. Axelrad's "long-standing disease in his colon, which [Dr. Axelrad] had not had ever evaluated" was evidenced by the pathology report, which indicated fibrous tissue in the colon.[23] Dr. Reardon's operative report also reflected that the perforation in Dr. Axelrad's colon had some scar tissue associated with it. Dr. Jackson testified that if he had "all the pieces of the puzzle put together," he would not have recommended the enema because it was not "standard treatment for diverticulitis." Importantly, there is also evidence that when Dr. Jackson became aware of Dr. Axelrad's additional medical history indicating these long-standing bowel problems, on Tuesday morning following Dr. Axelrad's hospitalization, Dr. Jackson felt a CT scan was necessary and ordered the test done at that point. Ultimately, Dr. Axelrad's diverticulitis was revealed on the CT scan.[24] Thus, this is further evidence from which the jury could have reasonably found that had Dr. Axelrad disclosed his history of bowel problems, the diverticulitis may have been accurately diagnosed and the enema would not have been prescribed.

---

23. Specifically, it was noted in the pathology report that Dr. Axelrad had "acute and chronic diverticulitis."

24. Dr. Jackson testified that the diverticulitis "showed up" on the CT scan. Dr. Reardon stated, "[a] CT scan had been done when I saw him, because I had written that the CT scan shows possible diverticulitis,...." Dr. Dobbs also noted that Dr. Reardon's notes described the CT scan as indicating diverticulitis.

At trial, Dr. Axelrad testified he had seen a doctor for rectal bleeding in 1994. That doctor, Dr. Earle, performed a proctoscope, a procedure which Dr. Axelrad admitted was something most people do not forget. When questioned by Dr. Jackson's attorney, however, as to why he failed to disclose the visit to Dr. Earle during his deposition, Dr. Axelrad simply stated he had forgotten about it. When asked whether he had informed Dr. Jackson about the proctoscope in August of 1997, Dr. Axelrad testified that he neglected to inform Dr. Jackson of this procedure stating, "No. I don't recall telling him about Dr. Earle. I told Dr. Dobbs[25] the next morning."

Dr. Axelrad also acknowledged that Dr. Earle's records indicated he had recommended Dr. Axelrad return in 24 months for a colonoscopy,[26] but testified during his deposition that no one had recommended a colonoscopy prior to his treatment by Dr. Jackson in August 1997. Regarding this discrepancy in his testimony, the following exchange occurred:

Q. And in response also to the earlier questions about the colonoscopy, you talked about how you didn't hide this from anybody, that it was in Dr. Dobbs' records. That's the whole reason why I asked you in your deposition before August of 1997: Had anybody ever recommended a colonoscopy? And in you sworn deposition testimony taken years after the hospitalization, you said nobody had recommended one, didn't you?

A. I didn't remember to state that, Mr. Sprott.

Q. You didn't remember it? It is in the hospital record.

A. Mr. Sprott, I didn't review the hospital record before I was deposed.

Q. I see. So, another mistake, correct?

The jury was also aware that the information concerning a colonoscopy may have contributed to an accurate diagnosis. Indeed, Dr. Kanner, Dr. Axelrad's own expert witness, testified that a colonoscopy is important information in making a diagnosis of diverticulitis, stating it would be "useful to know." Dr. Sollenne, Dr. Jackson's expert witness, also testified that the recommendation would have "been useful in forming a differential diagnosis." This is some evidence that Dr. Axelrad failed to communicate this pertinent medical history to Dr. Jackson, and had he communicated it, a correct diagnosis may have been made.

Also, although Dr. Axelrad did not disclose his history of bowel problems to Dr. Jackson during his initial presentation, he had told Dr. Dobbs of "one episode of bleeding approximately one and one half years ago and a proctoscope was done and was within normal limits." Dr. Reardon's notes also indicated Dr. Axelrad had a history of "intermittent cramps and diarrhea over many months." In addition, there was evidence that although Dr. Axelrad had seen Dr. Earle in 1994, this information was never provided to Dr. Jackson as Dr. Axelrad's primary physician, though there was a note in Dr. Jackson's records indicating that Dr. Axelrad had seen a neurologist during those six years. This, too, is evidence that Dr. Axelrad neglected to inform Dr. Jackson of this pertinent medical history.

There was also evidence that Dr. Jackson obtained a medical history from Dr.

---

25. Dr. Dobbs was one of Dr. Axelrad's treating physicians at the hospital. Dr. Axelrad stated he continued to see Dr. Dobbs as his patient.

26. There was testimony that if a colonoscopy is done and nothing is found and no polyps are removed, the procedure should be done again every five years.

Axelrad. Dr. Jackson testified that when he first sees a patient, he takes a history and asks the patient what is "happening to them." Dr. Jackson also testified that when taking a history from a patient, he "routinely" asks the patient about any other medical problems they may have experienced since their last visit. From this, the jury could have reasonably inferred that Dr. Jackson asked questions which afforded Dr. Axelrad the opportunity to respond, disclosing both his pain and his history of bowel problems, facts which a reasonable and prudent person would disclose under the circumstances and facts necessary to make an accurate diagnosis.

Finally, Dr. Dobbs testified: "[m]ost patients who present with acute diverticulitis will complain of severe abdominal pain, primarily in the left lower quadrant . . . .," indicating that an "ordinary" patient would have both left lower quadrant pain and would communicate that fact to his physician.[27]

In sum, based on a review of the evidence supporting the adverse finding of contributory negligence, I would conclude that Dr. Axelrad's name was properly included in the comparative fault question and further, that there is sufficient evidence to support the jury's findings regarding his contributory negligence. *See, e.g., Sloan v. Molandes,* 32 S.W.3d 745, 752–53 (Tex.App.-Beaumont 2000, no pet.) (holding the evidence was sufficient to support the jury's finding that a patient was

contributorily negligent); *see also Carreker,* 396 S.E.2d at 588 (holding that trial court properly charged jury as to patient's contributory negligence in failure-to-diagnose case because evidence raised fact issue as to whether patient failed to fully disclose certain symptoms and medical history relevant to her condition when she was examined by the defendant); *Fall v. White,* 449 N.E.2d 628, 632–33 (Ind.Ct. App.1983) (acknowledging that a patient does not have a duty to diagnose his own condition, but upholding verdict because there was sufficient evidence that showed plaintiff had failed to follow the doctor's instructions and to give complete and accurate information); *Moodie v. Santoni,* 292 Md. 582, 441 A.2d 323, 327 (1982) (finding sufficient evidence to warrant contributory negligence question to jury in medical malpractice case).

Although a doctor has specialized knowledge to diagnose an illness, the diagnosis is often based on the exchange of information between the patient and his physician. The patient is in a better position to know exactly what his current symptoms are and his pertinent medical history. While a patient does not have a duty to diagnose his own illness, the patient does have a duty to cooperate with his treating physician. *See Elbaor,* 845 S.W.2d at 245. For his own safety, a patient must exercise ordinary care in cooperating with his treating physician. Patient conduct in commu-

---

**27.** The majority lists items of "direct evidence" in the record that allegedly refute any claim that there is evidence to support a reasonable inference Dr. Axelrad understood the diagnostic significance of lower left quadrant pain. From this statement, it is evident the majority misconstrues my analysis, which does not depend on whether Dr. Axelrad knew of the significance of that symptom. However, even assuming that the majority had correctly construed my analysis, the fact that Dr. Axelrad learned, after going to the

hospital, that he had diverticulitis, is not *direct* evidence that he neglected to fully disclose his symptoms and pertinent medical history; it is merely a clinical diagnosis. Moreover, Dr. Axelrad did not "diagnose" himself as having a "condition called 'rebound.'" "Rebound" is, as defined in the record, a physical finding or symptom. It is not a "condition." This, then is merely direct evidence that Dr. Axelrad erroneously communicated the symptom of rebound.

nicating symptoms and medical history that violates the standard of care, that is, to cooperate with his physician as an ordinary and prudent person would do under the same or similar circumstances, may result in a finding of contributory negligence.[28] *See Carreker,* 396 S.E.2d at 588; *Moodie,* 441 A.2d at 327; *Jamas,* 568 P.2d at 1115; *cf. Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 594–95 (Tex.1999) (noting in a products liability case, that although a consumer has no duty to discover a product defect, the consumer's conduct other than failure to discover is subject to comparative responsibility).

Though no Texas cases have directly addressed this issue, other states recognize the defense of contributory negligence where a patient fails to disclose all or part of his medical history to the defendant physician. For example, in *Oxford v. Upson County Hosp., Inc.,* 211 Ga.App. 59, 438 S.E.2d 171, 171 (1993), the patient, an adult woman, was diagnosed with gastroenteritis and mild dehydration and was admitted to the hospital. *Id.* Her physician [29] was aware that she had experienced dizziness prior to her admission, but the patient failed to inform anyone else of these symptoms; there was nothing in the patient's chart indicating she was unable to get out of bed or that she had been dizzy and lightheaded, and the patient did not inform the nurse that she experienced those symptoms. *Id.* at 172. When the patient told the nurse she needed to use the restroom, the nurse assisted her to the room and stood close by; however, while in the restroom, the patient fainted, striking her head on the wall. *Id.* The appellate court upheld the trial court's decision to charge the jury on issues of causation, failure to exercise ordinary care, and comparative negligence, holding that the patient was required to inform the professionals of her symptoms so they could exercise their professional judgment. *See id.* at 171–72. While some out-of-state authority supports the propositions stated in the majority opinion, taken together, these statements do not provide a clear and workable rule of contributory negligence for Texas professional negligence cases.

### 5. Conclusion

The majority crafts an unwieldly and imprudent legal standard for determining the legal sufficiency of the evidence of contributory negligence in professional malpractice cases. A better legal standard would be to determine whether, in light of the patient's duty to cooperate with his treating physician, there was some evidence at trial indicating that the contributory negligence of the patient was a proximate cause of the occurrence in question. Under this proper standard, there is sufficient evidence to support the jury's contributory negligence findings. Accordingly, the trial court's judgment should be affirmed, and I respectfully dissent.

---

**28.** In response to the majority, a "comatose patient" is not an ordinary and prudent person capable, at the moment, of cooperating with his treating physician.

**29.** The physician was not a defendant in the case.